REID, Judge.
This is a suit for wrongful death brought by Elisie Breaux, dative tutor of the minors Daniel Paul Leonard and Jennifer Anne Leonard, to recover for the death of the minors’ parents, Lloyd Leonard and Harriett Breaux Leonard, both of whom were fatally injured as a result of a collision between a freight train owned by the Texas and Pacific Railway Company, Incorporated, and a 1955 Chevrolet automobile owned and operated by the said Lloyd Leonard and in which his wife, Harriet Breaux Leonard, was riding as a guest passenger. The accident occurred at approximately 7:00 A.M. on the morning of September 23, 1961, at the intersection of Louisiana Highway 70 with the Texas and Pacific Railway Company, Incorporated’s tracks in Assumption Parish, Louisiana, known as the Magnolia crossing. The suit was brought against the Texas and Pacific Railway Company, Incorporated and its employees, D. J. Toney, engineerman, and Fred W. Wilson, Sr., fireman. In an alternative demand American Employers’ Insurance Company, liability insurer of the automobile being driven by Lloyd Leonard, was joined as a party defendant, in the event the driver Lloyd Leonard was found con-tributorily negligent in the death of his wife and guest passenger, Harriet Breaux Leonard.
The defendants Texas and Pacific Railway Company, Incorporated, D. J. Toney and Fred W. Wilson, Sr., filed a third party petition alleging that in the event judgment was rendered against them and in favor of Elisie Breaux, in his capacity as legal tutor of the minors and for their use and benefit for the injuries and death of their mother, Harriett Breaux Leonard, then the said Elisie Breaux, in said capacity would be responsible for the virile share of the said Lloyd Leonard as a joint tort feasor.
Plaintiff filed exceptions of no right and no cause of action to the third party demand, which exceptions were sustained by the Lower Court and the third party demand of the initial defendants was dismissed. Third party petitioners were granted writs by this Court and this Court maintained the exceptions insofar as impleading Elisie Breaux as dative tutor for said minors and overruled the exceptions permitting the impleading of Elisie Breaux, tutor, as the proper legal representative of the Succession of Lloyd Leonard, and the case was remanded to the Lower Court for trial on the merits. See 147 So.2d 693.
Trial of the case lasted ten days, and for written reasons assigned September 8, 1964, judgment was rendered against Texas and Pacific Railway Company, Incorporated, D. J. Toney and Fred W. Wilson, Sr., in solido, and in favor of Elisie Breaux (1) as dative tutor of the minor Daniel Paul Leonard in the amount of $45,750.00 and (2) as dative tutor of the minor Jennifer *643 Anne Leonard in the amount of $42,000.00, and (3) as dative tutor of both minors in the amount of $3140.00, “the three awards totaling the sum of $92,890.00 to bear legal interest from the date of judicial demand until paid, together with all costs, including the fee of W. E. Groves, which is fixed at $150.00.” The three figures stated in the judgment total $90,890.00 rather than $92,890. This same $2000.00 error in addition is shown in the reasons for judgment. No mention was made of a dismissal of the suit as against American Employers’ Insurance Company. Texas and Pacific Railway Company, Incorporated, D. J. Toney and Fred W. Wilson, Sr. have appealed from said judgment. Said appeal was answered by the plaintiff praying that the judgment be increased to a total of $354,341.00. No appeal was taken with regard to American Employers’ Insurance Company.
Plaintiff alleged in his petition the following grounds of negligence; Failure to provide special warnings to motorist of approaching train, especially considering the poor visibility caused by darkness and dense fog and mist and considering that the vision of motorists was obstructed by high growth of sugar cane and weeds and brush; driving train at an excessive rate of speed; failure to keep proper lookout; failure to ring bell or sound whistle before reaching intersection, in compliance with LSA-R.S. 45 :561; failure to clear right of way of weeds and grass and to provide special warning devices at a dangerous intersection constituting a trap for motoring public.
In his reasons for judgment the Trial Judge set forth the following findings of fact:
“On the morning of the accident and just prior thereto Mr. and Mrs. Leonard had left their home in Pierre Part and were traveling eastwardly along Louisiana State Highway No. 70 with the intention of proceeding to Baton Rouge where Mr. Leonard had a medical appointment. Lloyd Leonard was driving with his wife seated to his right.
“The Texas and Pacific train had left Thibodaux and was proceeding north-wardly towards Gary which is near Donaldsonville. The train was composed of five loaded cars, three empties, a caboose and two diesel engines. The train with engines weighed 700.2 tons. D. J. Toney, the engineer, was seated on the right hand side of the cab, with Fred W. Wilson, Sr., the fireman, seated to the left. Their respective seats are 29' 11Y2" behind the front of the engine, 32/ 10" from front steps, and from 10' to 12' above the tracks. The engine measured lO' 2" in width.
“As the automobile rolled upon the tracks of the Texas and Pacific right of way at the Magnolia crossing, which is located between Napoleonville and Gary, it was struck on its right side at and just forward of the right front door by the left front portion of the lead diesel engine.
“The point of impact with reference to the highway was in the eastbound traffic lane which was determined by scrape marks on the highway. There were no skid marks leading to or from the point of impact. Mr. Leonard was found, unconscious but still living, on the west side of the tracks about 60 to 70 feet north of the point of impact. State Troopers measured by tape the distance from the point of impact to where the front of the lead engine stopped and found the distance to be 610 feet. Mrs. Leonard’s body was found in the front seat of the automobile which was still attached to the front of the engine.
“The Texas & Pacific Railway right of way runs from Gary southwardly along the west bank of Bayou La-fourche until it reaches Napoleonville. It then crosses Bayou LaFourche and continues along the east bank until its termination at Thibodaux.
*644 “State Highway No. 70 leaves Highway No. 1 near Paincourtville and continues westwardly toward Pierre Part. This highway is a standard 20' two lane blacktopped highway. A traffic survey conducted by the State Department of Highways shows that at the time of the accident approximately one vehicle a minute crosses the intersection.
“On the western side of the Magnolia crossing and at a distance of S0.7 feet from the western rail is the standard and usual Louisiana Law stop sign. At a distance of 381.5 feet west of the intersection is a standard highway railroad crossing sign.
“The highway and railroad track intersect at right angles about a mile west of Bayou Lafourche and Louisiana State Highway No. 1. The crossing is outside the limits of any municipality and there are no houses, buildings, or other structures along either the right of way or the highway. All four quadrants of the intersection were devoted to the growing of crops of sugar cane. At the time of the accident, the southwest and northwest quadrants were in growing crops of sugar cane. The northeast and southeast quadrants were in plowed fields without growth.
“The record contains detailed site and topographical surveys made by Mr. Carl Pleck, C.E., called on behalf of the plaintiff, and a site survey made by Mr. D. E. Crouser, Jr., C.E., called on behalf of the defendants. No material differences are found in the surveys.
“The topographical survey made by Mr. Heck from various correlated points show that the growth of sugar cane in the southwest quadrant obstructed the view of a driver of a vehicle on Plighway No. 70 looking south-wardly. From other locations on the track, the view of the operators of a train from their positions in the cab would also have had an obstructed view of vehicles traveling eastwardly along Highway 70.
“Mr. Crouser testified that a motorist at a point 54 feet (4 feet behind the stop sign with front of car opposite sign) from the center line of the track, could not see a train if it were beyond 156 feet (167' to center of highway) south of the intersection. The closest point the driver of the car would have an unobstructed vision of the track looking towards the south would be a point on the highway 36 feet from the center line of the tracks.
* * * * * *
“The train, on the morning of the accident, was being operated under special orders for that day with reference to its speed. These orders provided that the train would be operated from Gary to Napoleonville (on the west bank of Bayou Lafourche) and from Mile Post G-14 (on the east bank of Bayou Lafourche) to Bridge 29.4 (at Thibodaux) at a speed of 20 miles per hour. The other speeds along the route from Napoleonville to Thibodaux were regulated by Time Table 58, which required a speed of 6 miles per hour across the bridge at Napoleonville and at not more than 30 miles an hour along other portions of the track from this bridge to G-14.”
Mr. Crouser actually testified that a motorist 611/2 feet from the center line of the track would have an unobstructed view down the track for 167 feet, that from 54 feet the motorist would have a view of approximately 195 feet, and at a distance of 36 feet the driver would have an unlimited and unobstructed view looking south along said track, all of this only to the extent that the view would be obstructed by the growing sugar cane, there being no other obstruction in the way of a motorist’s vision. Mr. Crouser also testified, however, that in both of the first two instances, while the motorist would have a view of 195 and 167 feet, the *645 fireman seated in the cab of the engine on the left hand side while the front of the engine was at that point could not see the motorist, thus indicating that a motorist would be able to see the train before the fireman would be able to see the motorist.
Although plaintiff alleged in his petition that the railroad was negligent in the maintenance of its right of way, there was no evidence introduced which would indicate such negligence on the part of the railroad. In fact all evidence clearly indicates that the right of way was properly maintained.
The record shows that on the morning of the accident the sky was overcast and there was fog and mist. There was some conflict of testimony respecting the fog-as Hillary Richard who was parked in a truck on the other side of the tracks at the time of the accident and the deputy sheriff testified that the visibility was SO to 70 feet while the fireman and engineer said 700 feet. This, of course, could be explained by the fact that the train operators were 12 feet above the tracks while the drivers of vehicles were only 4 feet from the ground.
The Trial Judge concluded that the intersection consisted of a blind crossing. He further concluded the train was at the time of the accident being operated at a speed of 10 miles an hour in excess of its speed limit adopted by the railroad and that if the train had been traveling at a slower rate of speed the accident would not have happened.
The Trial Judge did not find that the driver of the car was guilty of any contributory negligence whatsoever. He apparently placed no particular duty upon the driver of the car to be extra careful because of the fog, and concluded that the failure of the driver to hear the whistle was a remote ’ cause and would not contribute to the accident.
Although not specifically stated, in concluding that the crossing was a blind crossing the Trial Jrtdge was apparently attempting to apply the “dangerous trap” doctrine which was clearly set forth in McFarland v. Illinois Central Railroad Co., La.App., 122 So.2d 845, and Simon v. Texas & N. O. R. R. Co., La.App., 124 So.2d 646. An examination of the record, however, fails to disclose that the facts in this case fit the “dangerous trap” doctrine as applied in those cases. In the McFarland case there was a municipality involved where the tracks were higher than the elevation of the street, the railroad right of way had not been cleared, and the railroad had negligently spotted box cars at a position so as to obstruct the view of motorists. In the Simon case the railroad had permitted heavy growth on the right of way. In the present case the record shows that the right of way was clear and there were no obstructions except the sugar cane, which, of course, was not on the railroad property. There were no distracting noises to interfere with the hearing of the driver. Also, in the case of Renz v. Texas and Pacific Railroad Company, La.App., 138 So.2d 114 (1962), cited by the plaintiff, the factual situations were different from the instant case. In that case there was a steep incline where the Renz vehicle crossed the railroad tracks and neither the northbound nor the southbound motorist could observe the other until at the crest of the crossing. The facts showed the railroad had left two long gondola cars parked on the spur tracks four to six feet west of the gravel road, and a northbound motorist could not see a train approaching from the west until its front wheels were on the tracks. It cannot, therefore, be concluded that the factual situation in the Renz case would apply to the case at issue.
The presence of heavy fog or mist does not make an ordinary crossing a dangerous trap or blind corner. See Guidry v. Texas & New Orleans Railway Co., La.App., 56 So.2d 601, and Gray v. I. C. R. R. Co., La.App., 132 So.2d 61. We do not find, nor does plaintiff cite, any case holding that the mere growing of sugar cane, or any other crop, off the railroad right of way together with the presence of fog and mist *646 would turn an ordinary crossing into a blind corner. A close examination of the Trial Judge’s own finding of the facts in the case before us negates the very entrapment doctrine. It is therefore our opinion the conclusion of the Trial Judge that the intersection was a blind corner or a dangerous trap is erroneous.
Regarding the allegation of negligence due to failure of the crew to sound proper warning signals by the use of whistle or bell, the record contains testimony of the entire train crew to the effect that all the warning devices were in operation continuously for over a quarter of a mile before Magnolia crossing, and a disinterested witness, Mr. Richard, who had approached the intersection of the highway and the tracks from the opposite direction, testified as follows :
“Q: Mr. Richard will you state if you were on Highway 70, going to Pierre Part in a truck on the morning of September 23, 1961, at approximately 7:00 A.M. ?
“A: Yes sir.
“Q: Who was in that truck with you?
“A: Burt Hebert, Jr.
“Q: Who was the driver of the truck?
“A: Mr. Burt Hebert.
“Q: Now, Mr. Richard, where were you and Mr. Hebert coming from ?
“A: Coming from Thibodaux.
“Q: Where were you going?
“A: Pierre Part.
“Q: And you were proceeding on Highway 70?
“A: Yes sir.
“Q: Do you know where Magnolia crossing is?
“A: Yes sir.
“Q: Now, when you and Mr. Hebert arrived in the vicinity or prox-iminity of the railroad tracks and this Magnolia crossing, what did you do?
“A: Well, as we approached the track, we heard the train whistle so we come to a stop to wait for the train to go by.
“Q: Do you recall when you first heard the whistle?
“A: No sir.
“Q: Did you hear a bell on that engine?
"A: No, sir, it was a whistle.
“Q: You heard the whistle?
“A: Yes sir.
“Q: Do you know the reason why this truck in which you. were riding stopped?
“A: Because we heard the whistle— the train coming. We heard the whistle of the train so we stopped.
“Q: How far from the railway track at Magnolia crossing was the truck stopped, approximately?
“A: Oh, about 70 feet before we got to the track.
“Q: Do you know at what speed this truck was approaching the railway tracks at Magnolia crossing on Highway 70?
“A: No, sir, I don’t.
“Q: Now, you were sitting in what position in that truck, in the front seat?
“A: Yes sir.
SQ: The truck has only one seat ?
*647 "A: Yes, sir, it did.
“Q: You were sitting on the right side?
“A: Yes sir, opposite side of the driver.
“Q: Was it foggy? What was the condition of the weather ?
“A: It was real foggy, sir.
“Q: What was the visibility, how far could you see?
“A: Well, it’s hard to say, I’d say about 50 feet ahead of you or 60, something like that
“Q: But the visibility was good enough for you all to proceed in your truck?
“A: Yes sir.”
Mr. Richard further testified on cross-examination as follows:
“Q: Then, Mr. Richard, I think you said you didn’t see the train until it got to the crossing, until the collision occurred—
“A: Yes sir.
“Q: Is that right ?
“A: Yes sir.
“Q : What prevented you from seeing the train?
“A: Well, I guess we just wasn’t looking for the train. Being that we heard the whistle, we knew the train was coming so we didn’t even know which direction the train was coming in.”
The evidence is quite clear that there were warning signs given. This fact is conceded by the Trial Judge in his written reasons for judgment, although he stated in his opinion the growth of sugar cane coupled with the fog made hearing of the whistle ineffective while the driver was at or near the Louisiana Law stop sign. He also concluded the situation would have been different on the opposite side where Mr. Richard was because there was no sugar cane growing on that side of the tracks. This assumption of the Trial Judge is based on the testimony of Mr. Flotte, a consulting engineer, who concluded, because of the fog, the sugar cane, the difference in the density of the air at ground level and above the fog, and the difference in temperature, that in all probability the intensity of the sound created a zone of silence. All of this was pure supposition on the part of Mr. Flotte and while it could be assumed the sound might be somewhat distorted while the car was behind the sugar cane, it would not explain the failure of the driver to hear the whistle during the last 36 feet where there was no sugar cane, especially if we accept, as the Trial Judge apparently did, Mr. Flotte’s estimate of the speed of the car at approximately 3 to 41/2 miles per hour. It is clear by a preponderance of the evidence that the warning signals were given and, the theories of Mr. Flotte to the contrary notwithstanding, the driver of the vehicle could have heard, or, if he had been paying attention, should have heard the whistle at approximately the same time Mr. Richard heard the whistle.
The evidence regarding the speed of the train is, as in most cases such as this, conflicting. The members of the train crew testified the train was traveling at approximately 20 miles per hour at the time of the accident. The record shows their estimate of the speed was not measured by a speedometer but by the train crew checking the speed from mile post to mile post by the use of their watches. The conductor’s report indicated the train covered the distance from Elmer, its last stop prior to the accident, to Magnolia crossing, in 50 minutes. Mr. Heck, Civil Engineer, testified the distance from Elmer to Magnolia crossing was 19.23 miles while Mr. Crouser, also a Civil Engineer, testified the distance was 19.33 miles. This would indicate the train had traveled at *648 an average speed of slightly in excess of 23 miles per hour. Mr. Flotte applied his formulas to the measured stopping distance of 610 feet and concluded the train was traveling at a rate of speed from 29.6 miles per hour to slightly in excess of 30 miles per hour, his computations thus indicating the train was exceeding the speed set by the special orders of the day by 10 miles per hour.
According to Mr. Flotte’s testimony, he considered certain known factors, that is, the distance from the point of impact to where the train stopped, and the weight of the train. He then applied them to mathematical formulas which included, among other factors, velocity, retarding force, breaking resistance, friction, and an estimate of the time factor before maximum brake pressure is reached in an emergency control application. However, on cross examination it was brought out that Mr. Flotte did not have any particular knowledge of the brake system of the train in question; that he was unfamiliar with the type of brakes on the railway cars; that he had assumed as a factor that the brakes on the cars were designed 60% empty car weight braking force; that he did not know whether the brakes had two shoes to a wheel or more or less; and that he was unfamiliar with the design of the control valve on the braking system of the particular engine. Of even more importance is that fact that his formula did not account for reaction time, which is an important factor in dealing with stopping distance in matters of seconds.
The defendants called as an expert a Mr. Thomas J. Womack, a retired railroad engineer, who concluded that at 20 miles per hour the required stopping distance would be SS6 feet, which, when compared to the 610 feet in which the train actually stopped, would indicate only a very slight exceeding of the speed limit.
The Court, however, apparently based its estimate of speed entirely upon the suppositions of Mr. Flotte and completely ignored the testimony of Mr. Womack and of the train crew. With this finding we cannot agree. Mr. Flotte’s estimation of speed is based upon too many imponderables and assumptions. It is not our opinion that the plaintiff proved by a preponderance of the evidence the speed of the train was in excess of that set by the orders of the day.
It has already been established by jurisprudence that testimony by a train crew must not be disregarded because they might be biased or interested witnesses. In the case of Leger v. Texas & Pacific Railway Co., La.App., 67 So.2d 775, this Court held as follows:
“There is no reason shown by the record as to why the testimony of the employees of the defendant should not be taken as true and should not be given superior weight to that of plaintiff’s witnesses, which was all of a negative character. The same comment is true as to the speed of the train.”
After concluding that the intersection constituted a blind crossing and the train was being operated at 10 miles per hour in excess of the speed limits adopted by the railroad for the operation of its trains on the day in question, he then stated the legal question presented was whether or not the operation of the train under the circumstances constituted negligence and, if so, whether such negligence was the proximate cause of the fatal collision. The Trial Judge answered this question in the affirmative. Fie cited the ruling of the Louisiana Supreme Court in the case of Perkins v. T. & N. O. R. R. Co., 243 La. 829, 147 So.2d 646. In that case the Court held the violation by trainmen of speed regulations adopted in the interest of safety to be evidence of negligence provided the excessive speed of the train was a cause in fact of the fatal collision. In that case the Court further held it to be fundamental that the negligence is not actionable unless it is a cause in fact of the harm for which recovery is sought. It need not be the sole *649 cause provided it is a substantial factor in bringing about the harm. The Court further held that if the collision would have occurred regardless of such negligence, then it was not a substantial factor.
In determining whether or not the alleged excessive speed in the present case was in truth a cause in fact, the Trial Court proceeded to attempt to determine the speed of the vehicle and then to determine whether or not the accident would have occurred if the train had been going 20 miles per hour.
The only evidence as to the speed of the vehicle was one estimate made by the fireman to the effect, that in his opinion, the vehicle was proceeding at a speed of SO miles an hour, and the estimate of Mr. Flotte that it was proceeding at a speed of from three to four and a half miles per hour. In considering the speed of the vehicle, the Trial Judge used the testimony of Mr. Wilson, the fireman. Mr. Wilson testified at one point the car was 60 to 70 feet from the intersection when it was first observed and he was 30 to 40 feet from the intersection at that time, but when it was brought to his attention on cross examination that since the front of the engine was approximately 30 feet from where he was seated a collision with the front of the engine as happened in this case, could not have taken place, Mr. Wilson then stated the car was from 30 to 40 feet from the intersection when he first saw it. It should be pointed out that a close reading of Mr. Wilson’s testimony does indicate, despite some variations, that when he first saw the vehicle it was from 30 to 40 feet from the intersection. He was very indefinite as to the location of the train when he first saw the car.
The Trial Judge held that assuming the car was going SO miles per hour as Mr. Wilson testified, it would make no difference whether the engineer first saw the car at 30 or 40 feet or at 70 feet because the accident could not have happened if the train was traveling 30 miles per hour, using the measured distances set forth in the record, and be then concluded the Leonard vehicle was not being driven at the speed estimated by Mr. Wilson, all of which was unimportant in that Mr. Wilson made only a rough estimate and there is no factual evidence to indicate that the car was going SO miles an hour. Mr. Flotte had determined that if the car was 40 feet from the crossing when first viewed this point was 298 feet from the point of impact. He then concluded that if the train was traveling 30 miles per hour the car would be traveling A}/¿ miles per hour, but that if the train had been traveling 20 miles per hour the car would have been traveling 3 miles per hour, and then said that if the train had been traveling 20 miles per hour instead of 30 it could have stopped in less than 298 feet. The Trial Judge, using Mr. Flotte’s assumptions stated “the conclusion is obvious that the accident might have been adverted if the train had been proceeding at its prescribed rate or by slowing down.” (Emphasis added) Again, these calculations were made upon the basis of an estimate as to a point where the fireman was supposed to have first seen the car. It should be emphasized that Mr. Wilson was not definite as to the exact spot where he first saw the car nor as to where the train was when he first saw the car, and that Mr. Flotte’s estimation of the speed was based upon assumption and not upon fact, and thus it cannot be concluded definitely that the car was being driven at the speed assumed by Mr. Flotte. The Trial Judge concluded that having determined the speed of the car we can observe that the accident would not have happened if the operators of the train had been traveling their prescribed speed and their failure to take extra precautions in view of a blind crossing was a proximate cause of the ensuing collision.
 What the Trial Judge has in fact done is, first, designate the corner a blind crossing, second, designate the area where the vehicle was as a zone of silence, third, estimate the speed of the train as that given by a Civil Engineer based upon some *650 known factors and some assumed factors, fourth, take a statement by the engineer as to the location of the vehicle when he first saw it and determine at what spot the train was when the car was first seen and thus determine the speed of the car, and based upon all of those factors, the Judge concluded if the train had been going at a different speed the collision would have been avoided because the train could have either been brought to a stop or slowed sufficiently to avoid striking the vehicle. We cannot say that the record substantiates this reasoning, especially because the conclusions are based not upon fact but upon assumptions and estimations piled one atop the other. In effect what the Trial Judge has held is that when a vehicle, which was supposedly traveling somewhere in the neighborhood of 4 to 6 miles per hour, was first observed at a point approximately 30 to 40 feet from the intersection, and the train was 298 feet from the intersection, at a level crossing unobstructed except for growing sugar cane off the right of way, the visibility was admittedly between 50 and 60 feet, and the record shows the driver had an unobstructed view at a point 36 feet from the intersection, there was a legal duty imposed upon the engineer to immediately bring the engine to a stop. This is not substantiated by the jurisprudence of this State, especially when the record clearly shows that some of the warning devices were in operation and that another motorist heard the whistle and stopped his vehicle.
It is the opinion of this Court that tlie rule to be applied is set forth in Hymel v. T. & N. O. R. R. Co., 145 So.2d 138, cert. den. November 27, 1962, wherein the Court held:
“The jurisprudence is uniform that those in charge of railroad trains may presume that an individual or vehicle approaching a crossing will stop in time to avoid an accident; and the crew is not required even to attempt to stop unless there is reason to believe the approaching motorist is unaware of the oncoming train or does not intend to stop; and a motorist must exercise every sense to ascertain if it is safe to cross. (Citations)
“Assuming arguendo, that decedent could not see the train coming, he should have heard the approach of the train, as four disinterested witnesses heard the bell and whistle when the train was quite a distance from the crossing.
“Even if there were obstructions such as to prevent decedent’s being able to see down the tracks to his right as he proceeded towards the tracks, the greater duty was placed upon him to ascertain there were no trains in the vicinity.” (Citations)
It is the opinion of this Court that the plaintiff has failed to prove any negligence on the part of the defendants which was the proximate cause of the accident and, therefore, the judgment of the Trial Court should be reversed.
As already mentioned, the plaintiff sued the liability insurer of the decedent in the alternative, based upon the wrongful death of the mother of the minor children. However, no appeal was taken by plaintiff in the alternative. The judgment of the Trial Court did not mention the liability insurer, American Employers’ Insurance Company, by name but merely cast the defendants Texas and Pacific Railway Company, Incorporated, D. J. Toney and Fred W. Wilson, Sr., in judgment, apparently dismissing the suit insofar as American Employers’ Insurance Company is concerned. Therefore, as no appeal was taken from this portion of the judgment dismissing the suit insofar as the liability insurer was concerned the judgment in that respect is final. We have held that a plaintiff’s answer to an appeal perfected by only one defendant from a judgment entered against two defendants in solido could apply only to the appeal perfected by the appealing defendant, and under such *651 circumstances judgment for plaintiff against non-appealing defendant is final. See McKnight v. Scott, La.App., 130 So.2d 681.
Our Brothers of the Third and Fourth Circuits have taken the same view. See Vosbein v. Arras, La.App., 149 So.2d 727, and Howard v. Insurance Company of North America, La.App., 159 So.2d 560.
We held to the contrary in the case of Fussell v. U. S. F. & G. Co., La.App., 153 So.2d 911. In that case we held that an answer to an appeal taken by one of the defendants as to the judgment dismissing the suit against three co-defendants who were alleged solido co-debtors would serve to bring said alleged solido co-debtors before the Court.
However, the Fussell case, supra, could be differentiated from the case at bar. The plaintiff sought judgment against the defendants John A. Joiner, and his insurer; Mrs. W. F. Downs and her insurer; and the insurer of plaintiff’s vehicle. The Trial Court rendered judgment against Joiner and rejected the demands as against Mrs. Downs and her insurer, and the insurer of plaintiff’s vehicle. Defendant Joiner appealed from this judgment and plaintiff answered Joiner’s appeal seeking an increase in the award and that judgment be amended by making it solido against Joiner, Mrs. Downs and her insurer and the insurer of plaintiff’s automobile in solido.
In the instant case plaintiff sued only the T. and P. R. R. Co., Inc., the engineer D. J. Toney and the fireman Fred W. Wilson Sr. In the alternative and only in the event contributory negligence was found by the driver of the Leonard car, asked for judgment alternatively against the American Employers’ Insurance Company, its insurer. The three named defendants, T. and P. R. R. Co., Inc., Toney and Wilson appealed from the judgment herein and plaintiff answered the appeal seeking an increase in the award against these defendants and praying in all other respects the judgment be affirmed.
For the above and foregoing reasons the judgment of the Trial Court is reversed and judgment is rendered in favor of the defendants Texas & Pacific Railway Co., Inc., D. J. Toney and Fred W. Wilson Sr. dismissing plaintiffs’ suit at their costs.
Reversed and rendered.