HALL, Judge.
In this wrongful death action arising out of a railroad crossing accident the defendant railroad and the defendant engineer and fireman appeal from a judgment awarding $840,000 in damages to the widow and children of the decedent. Issues presented by the appeal are the negligence of the railroad crew operating the train, the contributory negligence of the decedent driver of the car which was struck by the train, the last clear chance of the railroad crew to avoid the accident, and the amount of damages.

Facts

The accident happened at approximately 10:55 a. m. on February 26, 1975 at the Thomastown crossing of the Illinois Central Gulf Railroad Company mainline track running between Vicksburg, Mississippi and Shreveport, Louisiana, the crossing being located in rural Madison Parish approximately nine miles west of the Vicksburg yard. The track runs east and west, parallel with and south of U. S. Highway 80. Parish Road 7 runs north and south, crosses the mainline track, and forms a T-intersection with U. S. Highway 80. In the vicinity of the crossing the railroad, track is straight and level. View of the crossing by personnel operating the train in a westerly direction is unobstructed for several thousand feet. Likewise, the view of the track by a motorist proceeding north at the crossing is unobstructed for several thousand feet. There are no buildings or other structures in the immediate vicinity of the crossing. Pertinent to a discussion of this accident, a whistle post or board is located 906 feet east of the crossing, milepost # 9 is located 1,734 feet east of the crossing, two trees are located 1,827 and 1,857 feet east of the crossing, and a pink house is located on the north side of Highway 80 at a point 2,026 feet east of the crossing with a tree located directly opposite the house on the south side of the railroad track.
The Illinois Central freight train consisted of 108 cars being pulled by five locomotives. Fifty-seven cars were empty and 51 were loaded. The total weight of the train, including locomotives, cars, and lading, was 7,495 tons. The train was 6,240 feet long. On the morning of the accident the freight train left Vicksburg headed westerly toward Shreveport.
Decedent, Allen Charles Fisher, was principal of the Thomastown High School which is located on Parish Road 7 several hundred feet south of the crossing. Fisher left the school, driving his 1973 Chevrolet Monte Carlo two-door sedan, and headed north on Parish Road 7.
Rosalie Watson, who lives in the Thomas-town area, was driving her car east on Highway 80 and made a right turn onto Parish Road 7. She saw the train coming from her left or from the east and stopped at the cross buck sign. The crossing is marked by standard railroad cross buck *345 signs located 15 feet from the track on each side of the crossing. Fisher approached the crossing from the south and either stopped or slowed prior to getting to the track. He proceeded onto the track and his car stopped with the front end across the track. The train struck the right front side of Fisher’s car which came to rest approximately 55 feet west of the crossing on the south side of the track. Fisher sustained fatal injuries including a broken neck and was found on the backseat of the car. The train came to a stop approximately 1,565 feet west of the crossing.

Summary of Eyewitness Testimony

The train was being operated by Walters, an experienced engineer, who was working as fireman on the day of the accident. He was seated on the right side of the locomotive cab. The engineer, Hadden, was seated on the left side of the cab. Pittman, the brakeman, was seated on the left side of the cab behind Hadden.
The crew members testified that the speedometer of the locomotive was broken but that they timed the speed of the train between mileposts with a watch and that the train was going 40 miles per hour at milepost # 9. The train had been gathering speed since it left Vicksburg. The maximum speed in this area authorized by the railroad’s operating rules and regulations was 45 miles per hour. There is no legal speed limit in this open country area.
Walters testified, backed up by the other crew members, that he started sounding the whistle and bell approximately three to four car lengths before reaching the whistle post and continued sounding the whistle and bell until impact. An average car length is 55 feet, so the estimates are that the whistle was sounded when the train was 1,071 to 1,126 feet from the crossing. The headlight of the locomotive was on and operating.
Each of the three crew members riding in the cab testified that they saw the Fisher automobile approaching the crossing from the south at a slow rate of speed. Walters and Pittman testified that the train was 10 to 15 car lengths from the crossing when they first saw the Fisher automobile. Had-den testified that the train was 8 to 10 car lengths from the crossing when he first saw the car. Converting car lengths into feet, the estimates range from 440 feet to 825 feet. The crewmen testified they thought the automobile would stop and that it hesitated and almost stopped but then continued onto the track, stopping with the front of the car over the track. Walters testified that when he saw the car stopped on the track he immediately put the train in emergency at a point when the train was about five to six car lengths, 275 to 330 feet, from the crossing. The train could not be stopped within that distance and the collision ensued.
None of the crew members recalled seeing the Watson vehicle stopped at the crossing on the north side of the track.
Walters and Hadden testified that if they saw a motorist stop on the track when they were one mile, one-half mile, or one-quarter mile away, they would sound the whistle and continue on under the assumption that the car would move off the track, and would not brake until it became apparent the car was not going to move. Both emphasized, however, that this is not what happened in this instance when the brakes were placed in emergency as soon as the car stopped on the track a short distance in front of the train.
Rosalie Watson testified for the plaintiff. It is somewhat difficult to summarize her testimony because, although she was obviously attempting to describe the events she witnessed as accurately as possible, her testimony was somewhat inconsistent and confusing on some critical points and details. Mrs. Watson testified she turned off of Highway 80 and saw the train down by the pink house (2,026 feet from the crossing). There are two tall trees there (1,827-1,857 feet). She saw the light of the train before she turned off of Highway 80 and the train was by the pink house. It was a little back of milepost # 9 (1,734 feet). Mrs. Watson stopped because she could not beat the train or did not want to try to beat the train in her old car. Mrs. Watson first testified *346 that Fisher came in a “few minutes” and stopped at the sign, but later testified in answer to a leading question that Fisher came up at about the same time, and that they “probably met up together almost.” She testified several times that he stopped. After seeing Fisher stop at the sign she looked back toward the train. When she looked back she saw Fisher’s automobile stopped on the track. The train started blowing its whistle at about the # 9 milepost (1,734 feet). She testified that Fisher was on the track when she first heard the whistle blow. She testified that Fisher never looked up and seemed to be fumbling and shaking, apparently trying to start his car. She was pleading to herself for Fisher to get off the track but he didn’t move. It all happened “real quick.” In her opinion the train was going about 50 miles per hour. Mrs. Watson went back to the scene of the accident later that day and drove up toward the pink house and determined the location of the train when she first saw it in relation to the pink house, the trees, and the # 9 milepost, although the milepost was not visible to her from the crossing at the time the accident happened.

The Expert Testimony

Testifying for the plaintiff was Robert A. MacRae, a physics professor at Jacksonville State University in Jacksonville, Alabama since 1967. MacRae has a bachelor’s degree in physics from Davidson University and a master of science in physics from Vanderbilt University. He has been interested in the braking of trains since 1975 or 1976, has made 80 or 90 studies, and has testified 25 to 30 times. His formula for calculating stopping distances was developed through principles of physics and studies of technical information and publications. Taking the known information concerning the consist of the train and established facts concerning the operation of a train’s air-braking system, using a braking ratio and coefficient of friction within the range of recognized standards, using a formula devised by him which is not completely described in the testimony but seems consistent in general with the formulas used for calculating train braking distances, and using a programmed computer, the professor charted the stopping distances for this particular train at various speeds. The professor testified to the following stopping distances:
40 miles per hour - 1,290 feet
44 miles per hour - 1,500 feet
49 miles per hour - 1,895 feet
On the assumption that the train traveled 23 car lengths plus five locomotive lengths past the point of impact (1,265 feet plus 300 feet, or 1,565 feet) and that the brakes were put into emergency at point of impact, Professor MacRae determined that the train was going 44 miles per hour, give or take four miles per hour. Assuming that the brakes were put into emergency six car lengths or 330 feet prior to point of impact, the total stopping distance of 1,895 feet would indicate a speed of almost 49 miles per hour, give or take four miles per hour.
The professor expressed the opinion that it would take the engineer approximately two seconds to react and put the train into emergency after perceiving danger and the need to take such action. He testified that if the train was traveling 40 miles per hour it would take 35 seconds for the train to travel 2,026 feet, the distance from the pink house to the crossing. At 44 miles per hour it would take 31 seconds. If the danger was perceived by the engineer at 2,026 feet and the train was traveling 40 miles per hour the engineer had 13 seconds or 736 feet to put the train in emergency and avoid the collision. If the train was traveling at 44 miles per hour the engineer had seven seconds or 461 feet to put the brakes in emergency and avoid the accident. Professor MacRae testified that if the train had been traveling at 40 miles per hour and the crew perceived the problem at the # 9 milepost, 1,734 feet, the engineer would have had 440 feet or six seconds time to put the brakes in emergency and avoid the collision.
Professor MacRae testified that if the brakes had been applied 1,000 feet from the point of impact there would have been significant slowing and less damage. It takes 19 seconds for the brakes on this train to *347 become fully operative and at the end of that time the train’s speed would have decreased by 10 miles per hour from a 45 mile-per-hour speed. If the train had been going 45 miles per hour and the brakes had been put into emergency at 1,000 feet from impact the train would have been going 36 miles per hour at impact with 37 percent less energy transfered than if the train had not been braked. If the train was going 45 miles per hour and was put into emergency at 1,500 feet from impact the train would be going 15 miles per hour at impact and there would be 89 percent less energy trans-fered. Braking the train going 40 miles per hour at 1,000 feet from impact would result in 61 percent less energy transfered at impact; braking the train going 40 miles per hour at 1,500 feet would result in the train’s stopping before impact.
Testifying for the defendant was Clifford A. Kifer, senior regional engineer for Westinghouse Air Brake Company, one of the two manufacturers of air brakes for railroads in the United States. Kifer has a mechanical engineering degree from the University of Pittsburgh and has been employed by Westinghouse for 27 years. He has conducted actual braking tests with trains and in calculating stopping distances uses a formula devised in the early 1900s by Westinghouse. He has testified in court about twice a year for the past 14 or 15 years. The record does not disclose the precise formula used by Kifer, but as in the case of the MacRae formula, it appears that his formula is probably generally consistent with formulas used in these matters.
On the basis of his calculations, Kifer testified to the following stopping distances:
40 miles per hour - 1,938 feet
45 miles per hour - 2,423 feet
48 miles per hour - 2,776 feet
49 miles per hour - 2,878 feet
Kifer testified that based on the speed of the train the stopping distance could be calculated within a variance of 10 percent one way or the other.
Based on an assumption that this train was placed in emergency 330 feet from the crossing and that the train traveled 1,400 feet past the crossing before it came to a stop for a total stopping distance of 1,730 feet, Kifer calculated the speed of the train at a little less than 40 miles per hour.
Neither expert attacked the formula of the other, although MacRae testified he considered his formula more accurate because it was calculated on a computer at one second intervals whereas the Kifer formula was not.
There is a significant variance between the stopping distances calculated by the two experts, both of whom are well qualified and both of whom seem to have used correct data and reasonable formulas. On balance, it appears that MacRae’s educational and scientific credentials are superior and that his calculations are more sophisticated and precise. Accordingly, we accept Mac-Rae’s calculations as being more nearly accurate, as did the trial court. At best, however, such calculations are educated estimates of speed and stopping distance in view of the variables involved in any specific situation, as recognized by both experts who qualified their opinions within certain ranges of variance.

Action of the Trial Court

This case was tried in July 1979, more than four years after the accident. In July 1980, about a year after the trial, the trial court handed down written reasons for judgment, finding for the defendants. The court found that the train was traveling 45 miles per hour and that its speed was not excessive. The court noted that Rosalie Watson’s concept of numbers and distances seemed lacking. The court found no reckless operation proven nor failure to maintain a proper lookout. No reasonable means of avoiding the collision was shown. The court found that Fisher stopped at the cross buck sign, drove onto the track, and never looked up. The whistle was blowing but he just sat there and the train struck the car. Mrs. Watson approached the crossing first and waited. Fisher apparently came to a partial stop but tried to make it across the track and failed. In considering *348 last clear chance, the court found that when the defendant’s crew became aware of the fact that the Fisher vehicle was not going to move it went into an emergency stop but it was too late and defendant could not have by reasonable care prevented the accident. The court further found Fisher guilty of contributory negligence in failing to observe the train and in failing to hear the warning whistle in time to abandon the car.
At the trial a substantial portion of Mac-Rae’s testimony was not recorded and transcribed, apparently due to a malfunction in the recording machine. On plaintiff’s motion the trial court granted a new trial, limited to the taking of MacRae’s testimony by deposition. MacRae’s testimony was taken and in September 1981, more than two years after the trial, the court handed down written reasons for judgment, finding for the plaintiff. The court recognized Mac-Rae’s opinion as being unbiased and his method as being newer and more precise and accepted his testimony that the train must have been traveling 49 to 50 miles per hour. The court found there must have been some inattention on the part of the train crew because they failed to observe Mrs. Watson’s automobile on the north side of the track. The court found the railroad negligent in failing to have a working speedometer which probably contributed to diverting the crew’s attention from the track. The court also found the crew was negligent in operating the train at a speed in excess of the regulated train speed limit. The court found that Fisher slowed at the signs and was justified in attempting to cross because the train was 2,000 feet away at the time. The court determined that when the emergency was in view before the train reached the whistle post it sounded its horn and whistle. The court found that if Fisher was negligent in getting on the track the train had time to have slowed rather than have continued to accelerate on seeing the vehicle crossing the track. The train crew must have failed to maintain their lookout while the car stayed on the track stalled, with the decedent trying to start the car. The court found that the train crew followed company policy in not slowing or stopping until it was too late to avoid a collision. A reasonable man should have observed the decedent’s position of peril before it became impossible to stop the train.

Standard of Appellate Review

The appellate court should not disturb the trial court’s factual finding in the absence of manifest error, that is, unless the finding is clearly wrong. The appellate review of facts is not completed by a determination that there is a reasonable factual basis for the finding of the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (manifestly erroneous). A finding may be clearly wrong in spite of the presence of some evidence in the record which, if believed, would support the finding. The appellate court should determine whether the district court judgment is clearly wrong considering all the evidence. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979); La.Const., Art. 5, § 10(B).

Burden of Proof

The plaintiff alleging negligence has the burden of proving the facts supporting a finding of negligence by a preponderance of the evidence. Wheat v. New Orleans and Northeastern Railroad Co., 245 La. 1099, 163 So.2d 65, 70 (1964); Perkins v. Texas and New Orleans Railroad Company, 243 La. 829, 147 So.2d 646, 648 (1962). The same burden applies to a plaintiff asserting the doctrine of last clear chance. Proof is sufficient to constitute a preponderance when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972).
Testimony by members of a train crew must not be disregarded merely because they might be biased or interested witnesses. Breaux v. Texas and Pacific Railway Company, 176 So.2d 640 (La.App. 1st Cir. 1965). However, it is not manifest error for the trier of fact to believe the *349 testimony of a credible witness rather than that of a train crew, and a judgment will not be set aside in a case where the testimony is conflicting when the testimony of the witness, if accepted as credible, is sufficient to sustain the judgment. Begnaud v. Texas & New Orleans Railroad Company, 136 So.2d 123 (La.App. 3rd Cir. 1962). Determinations of credibility should be made in the light of all the evidence.

Duty of the Railroad

The operator of a railroad train may presume that a vehicle approaching the track at a crossing will stop in time to avoid an accident. The train crew is not required to attempt to stop or even to prepare to stop unless there is reason to believe the motorist is unaware of the oncoming train or does not intend to stop. Gibson v. Kansas City Southern Railroad Company, 233 So.2d 26 (La.App. 4th Cir. 1970), writ denied, 256 La. 254, 236 So.2d 31 (La.1970); Parks v. Texas Pacific-Missouri Pacific Terminal R., 152 So.2d 845 (La.App. 4th Cir. 1963); Hymel v. Texas & New Orleans Railroad Company, 145 So.2d 138 (La.App. 4th Cir. 1962). Likewise, the operator of a train may assume that a motorist who starts across the track at a crossing will proceed across the track and will not stop on the track. Howard v. Illinois Central Railroad Company, 349 F.Supp. 141 (U.S. D.C., M.D. La., 1972).
In the Wheat case, supra, which involved a collision between a train and a stalled car at a crossing, the Louisiana Supreme Court held:
“The reasonable rule in such a case is that the engineer when sighting a person or a vehicle on the track can presume that he or it will move from the position of danger upon the sounding of the train’s bell or the blowing of its whistle or horn; that it is only when the engineer realizes that the warnings are not going to be heeded that he should make an effort to stop the train. This rule is recognized and approved throughout the country.... ”
The court concluded in that case that “the engineer was not negligent in failing to realize that the automobile was not going to move off the track at the first moment it came within his vision, and therefore was not negligent in failing to take steps to stop the train at that moment.” The court also recognized, however, the rule that when “the engineer saw and appreciated the peril, it was his duty to use every reasonable means to prevent the collision.”
Emphasis was given in the Wheat case, in which the train was a passenger train, to the duty owed by the engineer to protect the safety of the passengers and to the danger presented to passengers by an emergency stop. The court also noted that even if the engineer was held to a higher degree of care than stated in the opinion, the train could not have been stopped in time to prevent the collision had there been an immediate emergency application of the brakes.
Believing that the rule enunciated in the Wheat case must be viewed in the light of the facts of that case, we would apply a higher standard of care under the facts of the instant case involving a freight train traveling at a lesser rate of speed. Automobile — train cases are “to be adjudged on their own facts and circumstances — those surrounding the collision; litigants can no longer be subjected to hard and fast rules which are obsolete; there can be no absolute.” Odom v. Hooper, 273 So.2d 510 (La.1973).
In this case, when the engineer saw the automobile stop on the track and as soon as he perceived or should have perceived that the automobile was not going to proceed across the track, his duty was to attempt to stop the train by making an emergency application of the brakes. He was not entitled to continue on, relying on the sounding of the whistle and bell until it was too late to make an effort to stop. If, however, the train was not far enough away from the crossing at the time the automobile stopped on the track for the engineer to have stopped or significantly slowed the train by making an emergency *350 application of the brakes after perceiving the danger, then there can be no liability on the part of the railroad because there was no negligence and no last clear chance to avoid the accident.

Negligence of the Railroad

The key factual issue in this case is whether the train was far enough from the crossing at the time the Fisher automobile stopped on the track that the train crew could have stopped or significantly slowed the train prior to the collision. If the accident happened in the manner testified to by the train crew, there obviously was no negligence on the part of the crew. Their testimony was that the Fisher automobile approached the crossing at a slow speed, almost came to a stop, and then continued onto the track, stopping with its front end across the track at a time when the train was about six car lengths or 330 feet from the crossing. Clearly, the train could not have been stopped in time to avoid the collision.
The only evidence contrary to the testimony given by the train crew is the testimony of Rosalie Watson. Her testimony was that the Fisher automobile drove onto the track and stopped when the train was at the # 9 milepost, a distance of 1,734 feet from the crossing. If her testimony is precisely accurate, it might have been possible for the engineer to have perceived the danger and reacted by making an emergency application of the brakes in time to stop the train or substantially reduce its speed prior to the collision.
Considering all the evidence, it is our view that the factual findings of the trial court that the train was 2,000 feet from the crossing when Fisher started across the track, that the crew was inattentive and not keeping a proper lookout, that the crew continued ahead while the car was stalled on the track, and that the crew had time to slow the train, are clearly wrong. Mrs. Watson’s testimony, weighed against that of the train crew, is not sufficient to establish by a preponderance of the evidence that the train was a sufficient distance from the crossing at the time the Fisher automobile stopped on the tracks for the train to be stopped or significantly slowed prior to the collision.
There are a number of factors which weigh against acceptance of Mrs. Watson’s testimony as precisely accurate and credible. To accept her testimony that the train was 1,700 feet from the crossing when Fisher stopped on the track would require the court to totally disregard the testimony of the members of the train crew and to find their testimony untrue. Mrs. Watson’s lack of perception of time and distance is demonstrated repeatedly in her testimony. It is important that she thought the train was so close that she should stop and not try to beat it, and she reached the crossing before Fisher did. By reference to landmarks, she testified the train was 2,000 feet away when she first saw its lights before she turned off of Highway 80 onto the parish road. After that, she turned onto the parish road, stopped at the cross buck sign, saw Fisher come up and stop at the sign, looked back at the train which started sounding its whistle, and then looked back and saw Fisher’s automobile on the track. By this time, several seconds had surely elapsed since she first saw the train and the train would have traveled several hundred feet, putting it closer than the milepost 1,700 feet away. If the train was as far away as Mrs. Watson estimated when Fisher’s car stalled on the tracks, Fisher would have had ample time to get out of the car and away from the tracks. Mrs. Watson was clearly an unschooled and untrained observer, and the accident naturally caused her to be excited and emotional. As she said, it all happened “real quick.” She testified the train was sounding its whistle when she first saw Fisher on the track, which would be consistent with the crew’s testimony that the Fisher vehicle moved onto the track after the train started sounding its whistle at the whistle board, 900 feet from the crossing.
Unless the train was as far, or almost as far, as the milepost when Fisher stopped on the track, it would have been impossible to stop the train in time to avoid the collision, *351 regardless of which expert’s stopping distances are accepted and regardless of which estimate of the train’s speed is accepted. Plaintiff failed to establish by a preponderance of the evidence that the train was that far away, and consequently failed to prove negligence on the part of the train crew that was a legal cause of the accident.
This determination that the evidence fails to establish that the accident could have been avoided by the train crew after the danger arose and became apparent to the crew precludes a finding of negligence and, as well, application of the last clear chance doctrine.
Because of this determination, it is unnecessary to consider the other issues raised by the appeal.

Decree

For the reasons assigned, the judgment of the district court is reversed and plaintiff’s demands are rejected, at plaintiff’s costs, including the costs of appeal.
Reversed and rendered.