428 So.2d 431 (1983)
Mrs. Minnie Fisher, Jr., Widow of Allen Charles FISHER, et al.
v.
Forrest WALTERS, Richard Hadden, Sr., and Illinois Central Gulf Railroad.
No. 82-C-1827.
Supreme Court of Louisiana.
February 23, 1983.
Rehearing Denied March 25, 1983.
*432 James D. Caldwell, Richard V. Burns, Baton Rouge, for applicant.
Wood T. Sparks, Thompson, Sparks, Cudd & Dean, Monroe, for respondents.
WATSON, Justice.
This lawsuit concerns a February 26, 1975, collision between a train and a car in which the car's only occupant, Allen Charles Fisher, Jr., was killed. Plaintiff is the widow of the deceased driver, Mrs. Minnie Fisher, Jr., individually and on behalf of their six minor children.[1] Named as defendants are Illinois Central Gulf Railroad Company and two of its employees, Forrest Walters and Richard Hadden, Sr. The trial court gave a judgment for Mrs. Fisher, individually and on behalf of her minor children, against all defendants for $840,000. The Court of Appeal reversed the judgment and dismissed plaintiff's suit. Fisher v. Walters, 415 So.2d 343 (La.App. 2 Cir.1982). A writ was granted to review the judgment of the Court of Appeal. 420 So.2d 451 (La., 1982).

FACTS
The train's home terminal is Bossier City. It was proceeding west from Vicksburg to Shreveport when the accident occurred at the Thomastown crossing in Madison Parish where Louisiana Highway No. 7 [then number 3030] crosses the railroad tracks. A pink house is located 2,026.12 feet east of the crossing; mile post number nine is 1,734.68 feet east and a whistle post is 906.58 feet east. The operative facts of the accident are reflected in the testimony of the following witnesses:
The conductor of the train, Lee Jefferson Clark, testified in deposition that the train was over a mile long with five engines and one hundred and eight cars, which average fifty-five feet in length. Clark was in the caboose. The train left Vicksburg at 10:10 A.M., forty minutes past its scheduled departure time. It hit the car in Thomastown, nine miles from the railroad yard, at 10:50 A.M. The car was going north and "must have went dead" (Depo. 38). Five engines and twenty-three cars passed the point of impact before the train came to a stop. It was a good stop; Clark did not feel the impact.
Defendant Forrest Walters testified that he was working as a fireman and actually running train number 269 the day of the accident. He was sitting in the single right seat by the controls. He was not allowed to run ahead of schedule, but was sometimes as much as twelve hours behind schedule. There is a curve at Mound which is located near mile post seven. From Mound to the point of the accident there are two miles of straight track. The accident occurred in February when the trees were bare. The maximum authorized timetable speed for the train was forty-five miles per hour. The speedometer on the train was not working that day. Walters and engineer *433 Hadden had just checked the speed between mile posts seven and eight, and eight and nine, and the train was running approximately forty miles per hour. The front end of the Fisher vehicle was on the track and the train struck the right front fender. According to Walters, if the train were a mile away from a crossing and he saw a vehicle stopped on the tracks, he would maintain speed. If he were half a mile from an intersection and saw a vehicle stopped on the tracks, he would not slow or stop. If he were a quarter of a mile away from the vehicle stopped on the tracks, he would not try and stop the train without an indication that the vehicle could not or would not move. Automobiles often pull up on the track but proceed across after being warned. Walters did not know how quickly he could stop the train.[2] Walters first saw Fisher's car when he was ten to fifteen car lengths away. He said he applied the emergency brakes five to six car lengths from the crossing when it became apparent the Fisher car was not going to move. Red signal lights come on when the emergency brakes are applied. Walters had frequently observed vehicles stopped on the tracks. "... I don't know why they do it, and ahwhen you warn them, they get out of the way." (Tr. 244) Walters said he could not stop the train every time an automobile was on the track.
Richard H. Hadden, the locomotive engineer on the train, was in the left front seat watching the track for obstructions. He remembered checking the mileage on the right side of the train between mile posts seven and eight. Hadden first saw Fisher's vehicle eight or ten car lengths from the intersection.[3] The train whistle was blowing and the headlights were burning. When the train was five or six car lengths from the automobile, Walters put on the emergency brakes. Hadden said that, if a vehicle were on the crossing when the train was 1,000 feet away, he would blow the whistle and expect the vehicle to get off the track. Unless someone were flagging to indicate distress, he would not try to stop. At 500 feet, he would probably go into emergency. However, it takes half a mile for the train to stop. Hadden related an incident in Rayville when a car stayed on the track until the train got right on top of it before moving off and the train went into emergency unnecessarily.
William R. Pittman, the brakeman on the train, was riding on the left side of the cab behind Hadden. He spotted the Fisher vehicle when the train was ten to fifteen car lengths from the intersection. According to Pittman, the train went into emergency four or five car lengths from the intersection.
In answers to interrogatories, defendants averred that the train was going thirty-five to forty miles per hour. There was no tape in the recorder which measures the train's journey.
Jack Lott, Jr., who investigated the accident for the state police, stated that Fisher's body was lying in the back seat of the car. His seat belt was not fastened. The white automobile had been knocked fifty feet from the point of impact. According to what the train personnel told Lott at the scene, the train's speed was forty-five miles per hour. The weather was clear and dry.
Boone Halbach, Madison Parish Superintendent of Education, testified about Fisher's income at the time of the accident. Fisher was described as a good employee with a bright future who had been a principal a year and a half. His salary with bonuses was approximately $19,000 per annum.
Rosalie Watson, a resident of Thomastown, testified that she stopped at the intersection. When she first saw the train it was beyond the pink house [2,026.12 feet east]. Because she was in an old 1968 car, she was not going to try to beat the train and she parked. She observed Fisher arrive *434 simultaneously from the opposite direction, stop at the cross-bucks sign and drive on to the tracks. Fisher then sat "shaking" and "fumbling" in his car. (Tr. 267) The car was also shaking while Fisher was looking down, apparently trying to start it. In Ms. Watson's opinion the train was traveling about fifty miles per hour and did not slow down. The train started blowing when it got to the number nine sign [1,734.68 feet east]. At that time, Fisher's car was "... there to stay until the train got him." (Tr. 292) The train did not blow continuously after the number nine mile post; it blew a long whistle, and then a short, and then another short one before the impact. She saw a white light on the train but never a red one. After the accident, Ms. Watson drove down the road to survey the area of the pink house and the number nine sign. She has lived near the crossing for eighteen years and is very familiar with the area. None of the train personnel saw her automobile at any time.
Robert A. MacRae, a professor of physics at Jacksonville State University, has a master's degree in physics from Vanderbilt University and testified as an expert in that subject. The train weighed 7,495 tons and was 6,240 feet long. It took nineteen seconds for the brakes to become fully operative. The lead locomotive of the train went 1,565 feet past the point of impact. At forty miles per hour, the stopping distance for the train was 1,290 feet. At forty-four miles per hour, the stopping distance for the train was 1,540 feet. Thus, if the train were going forty-four miles an hour, the brakes were not applied until the collision. If the brakes were applied six car lengths from the crossing, 330 feet from the Fisher automobile, the train was traveling forty-nine to fifty miles per hour. Its stopping distance at those speeds was 1,895 to 2,005 feet. If the crew observed the car at a distance of 2,026 feet, they had it in view for thirty-one seconds at forty-four miles per hour and thirty-five seconds at forty miles per hour. At forty-four miles per hour, applying the brakes 1,500 feet away would have slowed the train almost to a stop, and applying them at 1,000 feet would have substantially minimized the damage to the Fisher vehicle.
The trial court accepted the testimony of plaintiff's expert, Robert A. MacRae. Other stopping distances were calculated by the defendants' expert, Clifford A. Kifer. The court of appeal correctly noted that "MacRae's educational and scientific credentials are superior and ... his calculations are more sophisticated and precise. Accordingly, we accept MacRae's calculations as being more nearly accurate, as did the trial court." 415 So.2d 347.
Charles O. Bettinger, III, an expert in the field of business statistics, testified that the thirty-five year old decedent had a work life expectancy of 27.6 years and a total life expectancy of 36 years. The loss of income prior to trial was calculated at $91,997 for 4.4 years. Future losses from the date of trial, again using a six percent discount factor, amounted to $663,950. After subtraction of a twenty percent consumption allowance, the total present discounted value of past and future loss of wages was $604,758.
Mrs. Fisher was called to the accident scene and observed her husband lying on the back seat of the car with his legs hanging through the window. They had been married twelve years and had four daughters and two sons. She and the children have had emotional problems as the result of their loss. Fisher was driving a 1973 white Monte Carlo with power windows and power locks.
Nat Hovious, a claims agent for the Illinois Central Gulf Railroad, testified that he investigated the Thomastown collision. He took Mrs. Watson's statement and she said the train was right back of "that house yonder" when she got scared. (Tr. 387) At that time, she did not say anything about the number nine sign or the pink house. Hovious thought she pointed to another house, but the pink house is in a direct line with that house.
The trial court originally held for defendants. However, a new trial was granted for the purpose of retaking Professor Robert *435 MacRae's testimony. Almost all of his direct testimony had not been recorded and transcribed due to electronic malfunction. On reconsideration, the trial court held the railroad negligent.
The trial court stated in reasons for judgment:
"The expert, Professor Robert A. Macrae, found that the train must have been travelling at 49 to 50 miles per hour...." (Tr. 169)
* * * * * *
"There must have been some inattentive operation on the train, to have all three persons in the cab fail to observe Mrs. Watson's vehicle on the North side of the tract (sic).
* * * * * *
"Mr. Hadden stated it takes a half mile (2640 feet) to stop a train, yet he would not `brake' the train seeing someone afoul the track at 2000 feet, nor 1500 feet, but would go into emergency at 500 feet.
"Mr. Walters also stated policy of not stopping, nor slowing, to protect human life, at a half mile or quarter of mile even though it takes 2640 feet to stop the train.
* * * * * *
"The Court finds the Railroad negligent in failing to have a working speedometer. This probably contributed to diverting the engineer and his assistant's attention from the railroad track." (Tr. 170)
"There was negligence in exceeding the regulated train speed. Perkins v. Texas N.O. Railroad Co., 243 La. 829, 147 So.2d 646 (1962)." (Tr. 171)
* * * * * *
"The vehicle must have been there some time for the train crew to sound its horn, blow its whistle and finally within a few hundred feet when it would do no good, apply its emergency brakes.
"Plaintiff was in a position of peril. He kept trying to start his car.
"The train crew followed company policy. Do not slow or stop until it is too late.
"The train crew, which claims to have seen the car approach the track, must have failed to maintain their lookout while the car staying on the track stalled. The deceased is said to have been trying to start the car again, while Mrs. Watson prayed he would get the motor started again.
"Certainly a reasonable man should have observed the deceased's position of peril before the train itself became impossible to stop...." (Tr. 172)
Thus, the trial court found negligence in the train's traveling "49 to 50 miles per hour" (accepting Professor MacRae's opinion); failure of the crew to keep a proper lookout (not one of the three saw the Watson vehicle stopped at the crossing); failure to have a functioning speedometer (the crew did not know how fast the train was going); and following a policy of not braking or slowing a freight train to protect the life of persons stalled on the track.
On appeal, the court of appeal found as follows:
"... [I]t is our view that the factual findings of the trial court that the train was 2,000 feet from the crossing when Fisher started across the track, that the crew was inattentive and not keeping a proper lookout, that the crew continued ahead while the car was stalled on the track, and that the crew had time to slow the train, are clearly wrong." 415 So.2d at 350.

ISSUE
The issue is whether the trial court was clearly wrong, requiring the court of appeal to set aside the judgment and find for the railroad and its employees.

LIABILITY
Obviously, the train caused Mr. Fisher's death. The train crew had a legal duty to avoid striking the Fisher automobile, if possible. The question then becomes whether the collision was the result of negligence by the railroad and its crew.

*436 Negligence of the Railroad

The court of appeal noted that "[i]f her [Rosalie Watson's] testimony is precisely accurate, it might have been possible for the engineer to have perceived the danger and reacted by making an emergency application of the brakes in time to stop the train or substantially reduce its speed prior to the collision." 415 So.2d 350. Not only did the trial court rely on Rosalie Watson's testimony, but the record gives no basis for doubting its veracity. Ms. Watson is apparently an uneducated person, but because of her familiarity with the area, she was able to give a graphic account of exactly what happened. In relying on Ms. Watson's testimony to the effect that the train was 2,000 feet away when Fisher approached the crossing, the trial court was giving weight to the witness' ability to relate the events to physical objects, "a tall tree by the pink house", "the No. 9 sign" and the like. The witness lived in the immediate area and was consistent in her testimony although she admitted not knowing measurements: "Feets, I don't know about no feets." (Tr. 288)
The court of appeal overlooked the corroboration of Ms. Watson's testimony by MacRae's calculations and ignored the fact that the two members of the train crew responsible for stopping the train were parties-defendant. Placing considerable weight on the train crew's testimony, the court of appeal failed to realize that there was either a falsification or a serious mistake in their account. They claimed to have clocked the train's speed at forty miles per hour. However, Professor MacRae put the stopping distance for forty miles per hour at 1,290 feet and the train went 1,565 feet past the crossing. These calculations completely discredit the crew's testimony about their speed. If correct as to speed, they did not apply brakes until 275 feet past the collision site. The train crew was obviously testifying incorrectly about either the speed or about putting on the emergency brakes several car lengths before the collision. The testimony of an impartial witness, here Rosalie Watson, should have been accepted over that of the train crew, badly mistaken about basic facts. Their testimony would naturally tend to minimize their negligence. Ignoring the bias of Hadden and Walters and the testimony of Rosalie Watson, the court of appeal substituted its judgment of credibility for that of the trial court.
The court of appeal also said the trial court was clearly wrong in finding a lack of proper lookout by the crew. Their own testimony mandates this finding. It is uncontradicted that none of them saw the Watson car stopped at the cross-bucks sign, and there is no dispute that it was there.
While there was no legal speed limit for the train in this open country, the railroad's own speed regulation of forty-five miles per hour is evidence of the maximum safe speed in the area. See Perkins v. Texas and New Orleans Railroad Company, 243 La. 829, 147 So.2d 646 (1962) and Broussard v. Louisiana Western R. Co., 140 La. 517, 73 So. 606 (1916). The train was exceeding this limit, probably because it lacked a functioning speedometer.[4]
Testimony of the train crew, in particular defendants Walters and Hadden, establishes that they did not try to stop when they first saw the Fisher vehicle on the track and merely assumed the automobile would get out of the way. They candidly admitted that they would make no effort to stop in such a situation until it was too late to do so. Walters, who was running the train, had no idea how quickly he could stop.
The train could have stopped or substantially reduced its speed before hitting the Fisher vehicle. Thus, the train crew could have avoided or minimized the consequences of the accident. The record indicates that the train was traveling at an excessive speed of forty-nine to fifty miles an hour, and fireman Walters did not apply the brakes until the train was nearly on top *437 of the Fisher car.[5] With a clear and unobstructed view of the crossing for two miles, the crew of the train observed Fisher's car on the track but did not attempt to stop. The train crew discovered Fisher's peril early enough to avert the accident and their failure to stop or slow constitutes negligence. The defective speedometer, excessive speed and operator's lack of knowledge of the train's stopping capability combined with the crew's negligence to cause the fatality at the Thomastown crossing. The accident resulted from fault on the part of the train's owner and crew.
None of the other Louisiana cases are precisely on point in this situation. The court of appeal discussed Wheat v. New Orleans and Northeastern Railroad Company, 245 La. 1099, 163 So.2d 65 (1964). Wheat held that a passenger train engineer "... was not negligent in failing to realize that the automobile was not going to move off the track at the first moment it came within his vision, and therefore was not negligent in failing to take steps to stop the train at that moment." 163 So.2d 65 at 69. In the Wheat case, the car was not visible until the train was 1,000 feet from the crossing and the brakes were applied 300 or 400 feet later. Less than five seconds elapsed before the brakes were applied. According to the disinterested testimony of Rosalie Watson, this train was over 1,700 feet from the intersection when Fisher's car stalled on the track. The brakes were not applied until the train was 275 to 330 feet from the car. Even though the train in the Wheat case was traveling fifty-five or sixty miles per hour, the Wheat crew reacted in less than a third of the time that this train crew did. Wheat emphasized the engineer's duty to protect his passengers. A different and higher standard of care is required here where there is a freight train traveling at a lesser rate of speed.
Considering Rosalie Watson's testimony along with Professor MacRae's, the trial court correctly found that the train could have slowed significantly or stopped if the crew had acted promptly.

Contributory Negligence
Stalling a vehicle on a train track does not in and of itself establish negligence or victim fault. Louisiana and Arkansas Ry. Co. v. Fireman's Fund Ins. Co., 380 F.2d 541 (5 Cir.1967). In retrospect it would have been better for Fisher to leave his car, but his action must be judged under the stress of emergency and not on the basis of the calm deliberation available after the fact. Doyel v. Thompson, 357 Mo. 963, 211 S.W.2d 704 (Mo.1948).[6] From Ms. Watson's description, it appears that Fisher was shaking with fright. While Mr. Fisher did not live to testify about his conduct, the testimony of Rosalie Watson establishes that he was trying frantically to start his car which had, for unknown reasons, stalled on the track. Fisher was not required to follow Ms. Watson's super cautious example to be free from negligence. Without the car's malfunction, Fisher could have crossed the tracks safely. He did not violate LSA-R.S. 32:171,[7] because the train was over 900 *438 feet away and not in hazardous proximity to the crossing. Defendants did not prove that Fisher was negligent.

Conclusion as to Liability
The trial court's judgment holding the railroad negligent was based not only on Rosalie Watson's testimony, but on the opinion of an accepted expert, Professor MacRae, and the admissions of the train crew itself. The court of appeal's analysis of the case is clearly wrong and that of the trial court clearly correct. The court of appeal erred in reversing the judgment of the trial court.

DAMAGES
The trial court awarded Mrs. Fisher the sum of $100,000 for loss of her husband, each of the children $40,000 for the loss of their father, and $500,000 to Mrs. Fisher and the children for past and future loss of support. The evidence amply supports the awards; there was no abuse of discretion by the trier of fact. LSA-C.C. art. 1934(3).
For the foregoing reasons, the judgment of the court of appeal is reversed and the judgment of the trial court reinstated.
REVERSED.
LEMMON, J., concurs.
BLANCHE, J., dissents and will assign reasons.
NOTES
[1] Cheryl L. Fisher, Valarie D. Fisher, Angella Fisher, Sonja Rena Fisher, Allen Charles Fisher, III, and Adrian J. Fisher.
[2] "Q.... And you want to bring that train to a stop as fast as you can, how long does it take to bring that train to a stop?

"A. I can't answer that." (Tr. 239)
[3] In answers to interrogatories, defendants said the Fisher car was first seen when the train engine was ten to fifteen lengths from the crossing, the estimate of Walters and Pittman.
[4] The court of appeal did not address the significance of the inoperative speedometer.
[5] The other possibility is that the train was going only forty-four to forty-five miles per hour, and the brakes were not applied until the train hit the car. This would explain why the red lights were never seen by Ms. Watson. Failure to apply the brakes before the impact would constitute gross negligence.
[6] While he was "fumbling", Fisher may have been unfastening his seat belt. It is possible that the automatic door locks were malfunctioning and Fisher could not escape from the car. Various court of appeal cases erroneously indicate that failure to abandon a stalled car necessarily constitutes contributory negligence, i.e.: Johnson v. Clade, 309 So.2d 794 (La.App. 4 Cir.1975) and Tudury v. Cooperative Cab Co., 265 So.2d 307 (La.App. 4 Cir.1972). In these cases, the courts also found that the train could not have avoided the accident.
[7] LSA-R.S. 32:171 provides:

"A. Whenever any person driving a motor vehicle approaches a railroad grade crossing under any of the circumstances stated in this Section, the driver of such vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
"(1) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;
"(2) A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;
"(3) A railroad train approaching within approximately nine hundred feet of the highway crossing emits a signal in accordance with R.S. 45:561, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;
"(4) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.
"B. No person shall drive any vehicle through, around or under any crossing gate or barrier at a railroad crossing while such gate or barrier is closed or is being opened or closed."