404 So.2d 1323 (1981)
Natalie HILL and Lewis H. HIll, Plaintiffs-Appellees,
v.
Irving L. SILLS and Southern Farm Bureau Casualty Insurance Company, Defendants-Appellants.
No. 14661.
Court of Appeal of Louisiana, Second Circuit.
September 29, 1981.
*1324 Davenport, Files, Kelly & Marsh by Thomas W. Davenport, Jr., Monroe, for defendants-appellants.
Hudson, Potts & Bernstein by Jesse D. McDonald, Monroe, for plaintiffs-appellees.
Before PRICE, MARVIN and FRED W. JONES, Jr., JJ.
FRED W. JONES, Jr., Judge.
This appeal by a defendant automobile driver and his liability insurance carrier presents for our consideration the contention that damage awards to plaintiffs, husband and wife, were excessive. We answer in the negative and affirm.
Appellants do not contest the trial judge's adjudication of liability or his awards for medical expenses. However, they assert that he abused his discretion by (1) awarding the plaintiff husband $2,500 in general damages; (2) awarding the plaintiff wife $20,000 in general damages; and (3) awarding the plaintiff wife $16,240 for lost wages and $32,500 for diminished earning capacity.
According to the record, on February 28, 1977, Lewis Hill, accompanied by his wife, Natalie Hill, as a passenger, was driving a Datsun pickup truck north on 18th Street in Monroe. While stopped in a line of traffic the pickup truck was struck from the rear by a Lincoln automobile driven by Irving Sills and knocked forward about eight feet. As a result of the impact both Mr. and Mrs. Hill sustained whiplash injuries to their necks. They sued Sills and his liability insurance carrier. Trial was had on February 4, 1980, followed by rendition of the judgment in favor of plaintiffs. Those awards, about which the appellants complain, will be discussed separately.
Award to Lewis Hill
Hill, 47 years of age at the time of the accident, testified that he felt no immediate adverse physical effects but awoke the following morning experiencing pain and soreness in his neck and shoulder areas. This was alleviated when he took some pain medication his wife had on hand.
Prior to the accident Mrs. Hill had scheduled a regular physical examination with her gynecologist in Birmingham, Alabama (where they resided before moving to Monroe) for March 4, 1977. In view of this commitment she did not seek medical attention in Monroe for neck complaints which developed immediately after the accident, preferring to consult a Birmingham neurosurgeon who had treated her for a low back ailment several years before.
Hill accompanied his wife to the office of Dr. Donald Sweeney, the Birmingham neurosurgeon, and, because of continuing discomfort in the cervical area, requested that he be examined also.
Dr. Sweeney testified that his examination of Hill revealed a good range of neck motion but some restriction of shoulder movement accompanied by tenderness in the rhomboid muscles. X-rays of the cervical spine showed a condition described by Dr. Sweeney as preexisting mild cervical spondylosis. It was Dr. Sweeney's opinion that Hill had strained the muscles in his cervical region as a consequence of his involvement in the accident. The doctor's prognosis was that Hill's symptoms would last only two or three weeks provided there had been no aggravation of the underlying cervical spondylosisa contingency upon which Dr. Sweeney refused to speculate because the one time he examined Hill was too soon after the accident to make a determination of this nature.
About three months after the accident Hill was transferred by his employer to Jacksonville, Florida. Although muscle relaxants prescribed by Dr. Sweeney afforded him a measure of relief, Hill stated that he *1325 still had discomfort in the shoulder area when engaging in strenuous physical activities and, particularly, those requiring lifting his arms above his head. Therefore, on October 4, 1977, Hill consulted his wife's Jacksonville neurosurgeon, Dr. Edward Sullivan.
Dr. Sullivan stated that his examination of Hill revealed a full range of neck motion, an absence of tenderness in the cervical area and no palpable neck spasm. After reading the X-ray report prepared for Dr. Sweeney, Dr. Sullivan concluded that Hill had sustained a strain of the cervical spine superimposed upon preexisting degenerative changes. The prognosis was that Hill should expect maximum recovery from his injury within a time frame of from 12 to 18 months from the date of the accident.
Hill returned to Dr. Sullivan for a final visit on August 4, 1978, complaining again of pain across his shoulders following extended automobile trips or activities involving arduous physical exertion. Dr. Sullivan testified that this examination was essentially negative, with no abnormal neurological findings. He reaffirmed his original diagnosis that Hill suffered from dormant arthritis which had been activated by the trauma of the accident. It was recommended that Hill take aspirin for relief when needed.
At the trial Hill testified that he habitually avoided any physical activity which required raising his arms above the shoulder level. He declined to characterize his physical problem as either severe or "all that serious."
In view of the described circumstances, we cannot state that the trial judge's fact-finding that Hill suffered a minor cervical strain as a result of the accident was clearly wrong or that the general damage award of $2,500 was an abuse of his broad discretion.
Award to Mrs. Natalie Hill
(1) General Damage Award
The force of the impact between the Sills car and the truck occupied by the Hills was such that Mrs. Hill was thrown back, striking the left side of her head on a gun rack, and then forward, moving her neck in a whiplash fashion. She testified that she immediately felt pain in the left side of her neck. By the time she arrived at her residence she was also experiencing pain in the other side of her neck, and went to bed right away because of her extreme discomfort.
As previously explained, Mrs. Hill decided to delay seeking medical attention for her neck complaint until she visited Birmingham a few days later, and could be examined by Dr. Sweeney.
Mrs. Hill was seen by Dr. Sweeney in connection with her cervical injury but one time and then on March 4, 1977. Dr. Sweeney stated that she complained of severe pain in her neck muscles, radiating down into both shoulders. His examination revealed some restriction of neck motion and tenderness at the midpoint of her neck. X-rays showed a narrowing of disc interspace in Mrs. Hill's neck, with spurring, a condition described as characteristic of degenerative arthritic changes. Dr. Sweeney concluded that Mrs. Hill had sustained a cervical ligamentous strain superimposed upon a preexisting degenerative condition. He anticipated full recovery within two or three weeks if there was only soft tissue injury. Just as with Hill, Dr. Sweeney stated that the question of whether there was an aggravation by the accident of the preexisting degenerative condition could not be determined that soon after the accident and upon the basis of one examination. He prescribed medication for the relief of Mrs. Hill's pain.
Approximately three months after the accident Hill's employer transferred him to Jacksonville, Florida. Mrs. Hill stated that she continued to suffer ill effects from the accident and was particularly plagued with persistent headaches which started some three or four weeks following the accident. Therefore, on August 24, 1977 she consulted Dr. Edward Sullivan, a Jacksonville neurosurgeon.
Dr. Sullivan testified that he read the X-ray report prepared for Dr. Sweeney and also performed a physical examination of Mrs. Hill. Based upon the information thus *1326 obtained, he concluded that Mrs. Hill suffered from degenerative arthritis in her neck at the time of the accident and had sustained a cervical sprain which was superimposed upon this underlying condition. He recommended that Mrs. Hill wear a "Philadelphia collar" for three weeks to alleviate her neck discomfort.
Thereafter, Dr. Sullivan saw and treated Mrs. Hill on October 4, 1977, January 18, 1978, April 5, 1978, August 4, 1978 and November 27, 1978. During these visits she continued to complain of discomfort in the cervical region and nagging headaches. At the time of the April 5 visit she asserted that these headaches were occurring on a daily basis. Therefore, Dr. Sullivan prescribed the wearing of a 4-poster cervical brace with thoracic extension. This device apparently afforded Mrs. Hill some relief for her headaches.
Dr. Sullivan's final diagnosis was that Mrs. Hill had sustained a cervical strain superimposed upon and aggravating a preexisting arthritic condition.
At the time of the November 27 visit, Dr. Sullivan decided that his patient had reached her maximum point of recovery, and expressed the belief that whatever problem she was suffering from at that stage was permanent since it had not gone away as of that date. He told Mrs. Hill "if she needed his services or felt bad she ought to call him and come back." She did not return to Dr. Sullivan.
In the fall of 1979 Mrs. Hill's Birmingham gynecologist made an appointment for her with Dr. Charles Hammond at the Duke University Medical Center for the conducting of tests to determine the basis for an adrenal gland disorder. Informed by Mrs. Hill of her neck complaints, Dr. Hammond arranged for her to consult with Dr. Donald McCollum, an orthopedic surgeon at the medical center. Dr. McCollum examined Mrs. Hill on September 26, 1979.
Dr. McCollum testified that Mrs. Hill had a 30% limitation of neck motion in all directions, which he ascribed to an arthritic condition between the fourth and fifth vertebrae and between the fifth and sixth vertebrae. X-rays also revealed a loss of the normal forward curve of Mrs. Hill's neck. Based upon the results of his examination and the X-ray report, Dr. McCollum concluded that Mrs. Hill had a 25% permanent disability of the neck. In view of the history of the accident given by Mrs. Hill, this physician stated that her condition could be due to the trauma involved therein.
Dr. McCollum prescribed a regimen of physical therapy for Mrs. Hill, stating that more than 75% of his patients with similar cervical problems benefited from this type of therapy. If the physical therapy proved unsuccessful. Dr. McCollum recommended an operation entailing cervical fusion. Even with the latter, she would continue to have a 30% limitation of neck motion.
Mrs. Hill stated, at the time of the trial, that she was still suffering from neck injury sustained in the 1977 accident. Since any head movement caused considerable pain, particularly on the left side of her neck, Mrs. Hill testified that she habitually turned her entire body rather than just her head when the occasion demanded. She further contended that, because of her neck injury, she could not engage in strenuous physical activities, had to forego the pleasure of doing needlepoint, and could only do limited housework. Mrs. Hill conceded that since wearing the neck brace while traveling, as recommended by Dr. McCollum, her headaches occurred only about once a month rather than as frequently as before. She explained that these headaches were quite different from the migraine headaches from which she suffered prior to the accident.
The testimony of Mrs. Hill concerning her complaints of pain and discomfort in the years following the accident and describing her restricted physical activity was generally corroborated by her husband along with several relatives and friends.
Our careful consideration of this record does not show that the trial judge committed manifest error in his conclusion that, as a consequence of her accident, Mrs. Hill "suffered a serious cervical strain to the muscles and ligaments of her neck which aggravated a preexisting arthritic condition." *1327 Further, the award of $20,000 in general damages for her injury was not an abuse of his wide discretion.
(2) Award for Diminished Earning Capacity
Mrs. Hill was 44 years of age at the time of the accident. Although not then employed, she was a registered X-ray technician, having qualified for this vocation in 1956. She was so employed for over four years in Jacksonville, Florida and for over nine years in Birmingham, Alabama, before moving to Monroe in 1968 in connection with her husband's job with an insurance company.
Mrs. Hill testified that she did not seek regular work as an X-ray technician in Monroe because of the prevailing low wage scale. She also deemed it advisable to remain at home rather than work outside because her only child, a son, was then in grade school. However, she asserted that she had definite plans to resume her employment as an X-ray technician after her husband was transferred to Jacksonville, both because of the relatively high pay scale in that area and also because her son had graduated from college. In fact, Dr. Marvin McClow, a Jacksonville radiologist, stated that he would have employed Mrs. Hill on a parttime basis as soon as she became established back in Jacksonville, at a pay rate of $5.50 per hour.
The record shows that the work of an X-ray technician requires considerable physical exertionsuch as making overhead adjustments of X-ray machinery and handling heavy film cassettes. Mrs. Hill contended that she was physically unable to perform these tasks because of her cervical injury. Dr. Sullivan confirmed that efforts of this nature "would probably aggravate Mrs. Hill's neck condition to some extent." Therefore, he "would not recommend that she get involved in a very physical way." Dr. McCollum's opinion was that "her (Mrs. Hill's) disability would interfere with her duties as an X-ray technician."
The trial judge made the fact-finding that Mrs. Hill would have returned to her former kind of employment on January 1, 1978, but for her neck injury, and that this injury permanently disabled her from fully performing the tasks required of an X-ray technician. Since the record amply supports this conclusion, he did not commit manifest error in that finding.
It is now an established legal proposition in this state that a successful claimant is not only entitled to recover for his actual wage or income loss, but also for the effect of his disability on his capacity to earn. Even if unemployed at the time of injury, he may be entitled to an award for impairment of earning power. Such damages are calculated on the injured person's ability to earn money rather than on what he actually earned before the injury. The rationale underlying this jurisprudential rule is that the injury inflicted may have deprived the claimant of a capacity he would have been entitled to enjoy even though he never profited from it monetarily. See Folse v. Fakouri, 371 So.2d 1120 (La.1979).
The fact that Mrs. Hill was not totally disabled to perform any gainful employment is no bar to her claim for a diminution in her earning capacity. See Danna v. Howard Griffin, Inc., 388 So.2d 446 (La. App.2d Cir. 1980).
Damages for the impairment of earning capacity cannot be calculated with certainty and in the exercise of that function the trial judge must be accorded broad discretion. Harris v. Bardwell, 373 So.2d 777 (La.App.2d Cir. 1979).
In this case we do not find that the trial judge's award for diminution of Mrs. Hill's earning capacity, both past (between accident and time of trial) and future, constituted an abuse of his wide discretion.
For the reasons explicated, we affirm the judgment of the district court, at appellants' cost.