451 So.2d 597 (1984)
Dorothy WARD, et al., Appellees
v.
LA. & ARK. RAILWAY CO., et al., Appellants.
No. 16238-CA.
Court of Appeal of Louisiana, Second Circuit.
April 30, 1984.
*599 Wilkinson & Carmody by Arthur R. Carmody, Jr., Shreveport, for appellants, The Kansas City Southern Ry. Co., Louisiana & Arkansas Ry. Co., Jack R. Smith and O.L. Matlock.
Malcolm Wallace, in pro. per.
James R. Dawson, James W. Graves, and William T. Allison, Shreveport, for appellees, Dorothy Ward, Gordon C. Ward and Sandra L. Ward.
Before MARVIN, JASPER E. JONES and NORRIS, JJ.
JASPER E. JONES, Judge.
The Kansas City Southern Railway Company, it's wholly owned subsidiary Louisiana & Arkansas Railway Company, Jack R. Smith and O.L. Matlock, defendants, appeal a judgment against them for damages as a result of personal injuries sustained by Sandra L. Ward in an automobile-train collision. We affirm.
The judgment awarded Dorothy and Gordon C. Ward, who are the parents of Sandra, the sum of $27,109.68 for medical expenses incurred in the treatment of Sandra's injuries from the date of the accident until Sandra's eighteenth birthday. The judgment awarded Sandra $522,776.00 included future medical expenses, loss of earning capacity, and general damages.
The train involved in the accident was owned and operated by L & A Railway Company. Defendant, Jack R. Smith, was *600 the train's engineer and defendant O.L. Matlock was the train's conductor.

FACTS
The accident occurred at a railroad crossing on Shed Road in Bossier City at approximately 9:00 p.m. on the night of February 16, 1981. It was a cold clear evening. Sandra was riding in the front passenger seat of a Chevrolet Vega driven southerly by 15 year old Kelly Wallace.[1] Kelly was an unlicensed driver. Her older sister Tracy, a licensed driver, was riding in the back seat of the car. The car's windows were rolled up and the radio and heater were on.
Kelly neither saw nor heard the approaching eastbound freight train as she approached the crossing. She was traveling 25-30 miles per hour and did not slow down before entering the crossing. Before the Vega cleared the tracks, it was struck by the train which was traveling at 30 miles per hour. The Vega came to rest 32 feet from the point of impact.
The train was on a regularly scheduled run from Shreveport to Minden. Smith and Matlock were both in the lead engine unit of the 3 engine 40 car train. Matlock first noticed the Vega when both it and the train were approximately a quarter of a mile from the crossing. Smith noticed the Vega when it and the train were approximately 100-150 yards from the crossing. Both men testified the Vega appeared to be going a reasonable rate of speed and there was no indication it would not stop for the crossing. Matlock was the first to notice the Vega was not going to stop. He made this determination about 50-100 feet from the crossing. He yelled to Smith and Smith threw the train into emergency stop immediately before the collision. The train stopped 640 feet from the point of impact.
This crossing is within the city limits of Bossier City and has been since the general area surrounding it was annexed by the city in 1973. The city did not formally notify the railroad the area was annexed. There were no city limit markers along the tracks.
The crossing was marked by two Louisiana Highway Department railroad crossing signs placed along Shed Road on both sides of the crossing. The only other warning devices in the area were the standard "crossbuck" railroad signs immediately adjacent to and on both sides of the crossing. There were no flashing lights or movable barriers.
At the time of the accident the Bossier City Code contained a train speed limit ordinance.[2] At the Shed Road crossing which had no flashing lights, bells or movable barriers, the speed limit for trains is 5 miles per hour unless there is a flagman or watchman at the crossing. If there is a flagman or watchman or the crossing is marked by lights, bells or movable barriers, the speed limit is 15 miles per hour. There was no railroad flagman at the Shed Road crossing on the night of the accident. Therefore, the train's speed limit was 5 m.p.h.[3] There was a further train speed *601 limitation contained in the railroad company's special instructions to its employees included in the railroad timetable which established a maximum speed of 10 miles per hour on trains operating within the Bossier City limits.
The plaintiffs contend the train's crew was not sounding its whistle prior to arriving at the crossing. Kelly Wallace and the drivers of two other vehicles in the immediate vicinity at the time of the accident testified they heard no whistle. Smith and Matlock testified the whistle was being prudently blown. Two employees of a nearby business corroborated their story. The trial court found that the whistle was being blown. This finding is supported by substantial evidence and is correct.
Plaintiff also contends that vegetation along the track in the area of the crossing obscured Kelly's view of the track. There was substantial evidence to the contrary and the trial judge held the view of the crossing was not obstructed. We conclude this factual determination was not clearly wrong.
Liability was imposed upon the railroad and its employees for the train's violation of the speed limits contained in the Bossier City ordinance and the railroad's special instructions.
The appellants assign as error:
(1) the trial judge's finding that the train's speed of 30 m.p.h. was negligence which was the proximate cause of the accident; and
(2) the trial judge's determination that the 10 m.p.h. railroad Bossier City speed limitation and the 5 m.p.h. City Ordinance speed limitation was applicable to Shed Road when the railroad was never formally advised that the Shed Road crossing was in the city limits and these speed limitations had never been enforced.

LIABILITY
The duty/risk analysis as contained in Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Laird v. Travelers Insurance Company, 263 La. 199, 267 So.2d 714 (1972); and LeBlanc v. State, 419 So.2d 853 (La.1982), is applicable for the purpose of determining the appellant's liability to the plaintiffs as a result of their violation of the Bossier City speed ordinance and the railroad's own speed limitation contained in its special instructions. The appellants' duty is defined by the ordinance and the special instructions. The breach of that duty, however, does not equal liability unless: (1) the risk encountered by Sandra (she would be injured in a railroad crossing accident while riding as a guest passenger in a motor vehicle) is meant to be protected against by the duty; and (2) the breach of the duty was a cause in fact of the accident.
Appellants argue: (1) there was no duty for trains to be operated within the speed limits contained in the ordinance and special instructions; (2) the risk Sandra encountered was not covered by the duty, if there was one; and (3) the operation of the train in excess of the 5 and 10 m.p.h. speed limits was not the legal cause of the accident.
DUTY-RISK
The ordinance and the special instructions impose the duty upon the train crew to operate the train at a speed not in excess of the speed limits there provided.
Although not always discussed in the terms of duty-risk, the jurisprudence recognizes that the risk of being injured as an occupant of a motor vehicle involved in a railroad crossing accident is a risk that the duty to comply with train speed regulations was intended to protect against. See Martin v. Yazoo & M.R. Co., 181 So. 571 (La. App. 2d Cir.1938); Levy v. New Orleans & Northeastern R. Co., 20 So.2d 559 (La.App. Orleans 1945); Jenkins v. St. Paul Fire & *602 Marine Ins. Co., 393 So.2d 851 (La.App. 2d Cir.1981); Fisher v. Walters, 428 So.2d 431 (La.1983); Ketcher v. Illinois Central Gulf R. Co., 440 So.2d 805 (La.App. 1st Cir. 1983).
Appellants contend they had no duty under the ordinance or their special speed instructions because they were unaware the Shed Road crossing was in the Bossier City limits as the city never notified the railroad the area containing the Shed Road crossing had been annexed. The trial court correctly rejected this argument on the grounds the railroad had actual knowledge the crossing was in the city limits. Approximately one year before the accident the railroad contacted the city and requested it to close off traffic on Shed Road in the area near the crossing to facilitate railroad crossing repairs. If the railroad had not known the crossing was in the city it would have contacted the state or parish to secure the rerouting of traffic to permit crossing repairs. There would have been no reason to contact the city.
Appellants argue the railroad's action in contacting the city on this occasion was legally insufficient to impute it with actual knowledge. We disagree. The railroad had knowledge that the city had to be contacted in order to have traffic routed around the crossing. This establishes the railroad knew the crossing was in the city and the railroad's argument to the contrary has no merit.
Appellants next contend the ordinance was inapplicable, and imposed no duty, because it was enacted over 40 years ago, has never been enforced, and imposes an unreasonable speed limit on trains operating at or near the Shed Road crossing.
The record does not establish when the speed ordinance was initially passed but the copy of the speed limit provision contained in the record reflects that it was incorporated in the Bossier City Code of 1964. The special instructions contained in the record where the railroad imposed upon its trains in Bossier City a speed limit of 10 m.p.h. also contains no indication as to when it was first adopted. The railroad timetable contained in the record which includes this speed limitation specifically provides that it is effective "12:01 a.m. Saturday Jan. 1, 1977." From this information it is established that the speed limitations for Bossier City have been considered and approved less than twenty years before the accident which is the subject of this litigation. The conductor, who shares responsibility for the speed of the train with the engineer, testified that in practice the train was operated in Bossier City at a speed of between 4 and 8 miles per hour as an added safety measure. This evidence establishes the speed limitations were not unreasonable since the train's crew, who has the final responsibility for the safe operation of the train, operated the train at all times in the area they believed to be included in the Bossier City limits, below the 10 m.p.h. speed regulation and at times below the 5 m.p.h. limitation.
In support of their argument that a 5 m.p.h. speed limit is unreasonable in the area, appellants contend the crossing is in a semi-rural area on the outskirts of Bossier City. The record does not support this contention. This particular area, both in and outside the city limits, is undergoing rapid development and expansion. Because of this a large number of vehicles pass the crossing each day. A 24 hour traffic count taken shortly after the accident counted approximately 2700 vehicles.[4] With this volume of traffic at the crossing the 5 m.p.h. speed limit is not unreasonable. See Broussard v. Louisiana Western R. Co., 140 La. 517, 73 So. 606 (1916).
The appellants rely upon the case of McCray v. Illinois Central Railway Company, 244 So.2d 877 (La.App. 1st Cir.1971). The court there refused to accord any weight to a train speed ordinance adopted in 1909 in determining whether a railroad should be found negligent for its train's violation of the ordinance. Instead, the court charged the plaintiff with the burden of proving that the train's speed was unreasonable *603 under the circumstances. We conclude the court erred in this approach and should have here applied the duty/risk analysis required by Dixie Drive It Yourself Sys. v. American Beverage Co., supra.
We decline to follow the rationale of the McCray case. The train crew did not consider these speed regulations unreasonable in the area which they believed to be included in the Bossier City limits and had been substantially complying with them. The speed limit ordinance is a safety measure designed to protect the general public. Sandra was in the class of persons the ordinance was designed to protect and is not required to prove the speed limit contained in the ordinance was not unreasonable.
The fact the appellants have violated the ordinance and their own speed limitation at the Shed Road crossing since the crossing was placed in the city limits in 1973, does not detract from their duty owed the public at this Bossier City railroad crossing.
We find the appellants had a duty to comply with the speed limit ordinance. That duty was breached by the train's traveling 30 m.p.h. in a 5 m.p.h. zone.
We turn to the question of whether there was a duty for appellants to comply with the 10 m.p.h. speed limit contained in the railroad's special instructions. It has been held to be negligence for trains to violate company rules adopted in the interest of safety. Levy v. New Orleans & Northeastern R. Co., supra; Perkins v. Texas and New Orleans Railroad Company, 243 La. 829, 147 So.2d 646 (1962). See also Broussard v. Louisiana Western R. Co., supra; Fisher v. Walters, supra. We conclude the speed limit set by the special instructions is a safety measure. Therefore, there was a duty for the train to be operated at or below that speed limit. This duty was also breached.
Appellants contend that even if there was a duty, they cannot be held liable for the breach of that duty since the risk that Sandra would be injured was not included within the duty to operate within the speed limits contained in the ordinance and special instructions. They argue both measures are intended to control blocking of city roads by trains at railroad crossings and it would be sheer speculation and conjecture to find them to be safety measures. This contention is contrary to railroad crew testimony that it was a safety measure and is contrary to cases which we have earlier cited which hold speed regulations are designed to protect the public at railroad crossings.
The wording of the ordinance belies appellants' argument. It sets a speed limit of 5 m.p.h. at crossings where certain safety precautions have not been taken. At crossings where the precautions have been taken the speed limit is increased to 15 m.p.h. We further note that the Bossier City Code contains a separate and distinct blocking ordinance.[5]
We find that the ordinance and the special instructions are both safety measures designed to protect the general public from being injured by trains. The city and the railroad's executives would not pass measures imposing slow speed limits upon trains if their sole concern was to keep trains from blocking streets too long. The slower a train travels, the longer it takes to clear a crossing.
We have concluded the appellants breached a duty which protects the risk of Sandra's injury. There remains for our determination the issue of causation.
CAUSATION
Legal cause under a duty/risk analysis is defined as cause-in-fact. The breach of a duty is a cause-in-fact of an accident if *604 it is a substantial factor in bringing the accident about. In other words, it is an act or failure to act without which the accident would not have occurred. Dixie Drive It Yourself Sys. v. American Beverage Co., supra; Laird v. Travelers Insurance Company, supra; LeBlanc v. State, supra.
Appellants contend that the train's speed in excess of the speed limits set by the ordinance and special instructions was not a cause-in-fact of the accident because: (1) the negligence of Kelly Wallace was the sole cause of the accident; and (2) there was evidence in the record showing that at the time the train crew became aware the Vega was not going to stop for the crossing, they could not have stopped the train in time to avoid the accident even if its speed was only 5 m.p.h.
Kelly Wallace was negligent in the operation of her car. She breached her duty to see what she should have seen and hear what she should have heard. She should have been aware of the train and stopped at the crossing until it was safe to cross the track. Her negligence was a substantial factor in causing the accident. However, the fact that her conduct was a legal cause of the accident does not relieve appellants from liability if the train's speed was also a substantial factor in causing the accident. In Dixie Drive It Yourself Sys. v. American Beverage Co., supra, at p. 302, the court recognized there could be more than one legal cause of an accident.
The fact the train could not have stopped in time to avoid the accident even if it were complying with the speed regulations does not preclude a determination that the excessive speed of the train was a cause in fact of the accident. This court has previously pointed out that the causal connection between the excessive speed of a train and an accident is not that the train, if operated at the required slower speed, could have been stopped in time to avoid an accident. The causal connection is that the motorist would have had more time to hear and observe the train and stop his vehicle in time to avoid a railroad crossing accident. Jenkins v. St. Paul Fire & Marine Ins. Co., 393 So.2d 851, 856 (La.App. 2d Cir.1981) (aff. on writs 422 So.2d 1109). See also Broussard v. Louisiana Western R. Co., supra.
At the time of the accident the train was traveling at 6 times the legal speed limit and 3 times the railroad's self-imposed speed restriction. The liability imposing causal link is not that the Vega would have cleared the crossing before the train arrived if it had been obeying either speed limit. It is that the train would have been in Kelly Wallace's field of vision for a substantially longer period of time before she reached the crossing. She would have had more time to see and hear the train and to react to its presence, thereby avoiding the accident.
There is also evidence in the record to the effect that because of lights at an industrial complex located in the southwest quadrant of the intersection, a motorist traveling in the same direction as the Vega would have difficulty seeing the lights of a train approaching the crossing at night. Dr. Thomas Moss, an expert in the field of physics, testified the industrial complex lights tend to obscure trains' headlights. In his opinion, because of the configuration of the factory's lights, the headlights on an approaching train never emerge from the background. His testimony is corroborated by that of Gerald Adams and Dr. John Miciotto. Adams crossed the crossing in a pickup shortly before the Vega. He did not see the train's headlights until he was on top of the tracks and they were shining in his right window. At that time the train was only 30-40 yards from the crossing. Dr. Miciotto was driving a car approximately 80-85 yards behind the Vega. He did not see the train's headlights and only saw the train itself immediately before the collision. In light of the evidence that a train's headlights were difficult to see at the crossing, the length of time a driver has in which to observe the train is especially significant on the issue of causation.
Appellants point out a number of cases where the violation of the legal speed limit *605 was not found to be a cause-in-fact of an accident. Fontenot v. Lucas, 228 So.2d 211 (La.App. 3d Cir.1969) (30-35 in a 25 zone); McDaniel v. Welsh, 234 So.2d 833 (La.App. 1st Cir.1970) (speed slightly in excess of limit); Cross v. Delaney, 281 So.2d 168 (La.App. 4th Cir.1973) (25 in a 20 zone); Bland v. Interstate Fire and Casualty Co., 311 So.2d 480 (La.App. 4th Cir.1975) (65 in a 55 zone); Bennett v. U.S. Fid. & Guar. Co., 373 So.2d 1362 (La.App. 1st Cir.1979) (59 in a 45 zone).
The instant case is distinguishable from the cited cases on two grounds. The excessive speed involved in all of those cases did not approach six (or even three) times the legal limit and in these cases there were no facts established that would support a finding of a casual connection between speed and the accident.
The following quote from Broussard v. Louisiana Western R. Co., supra at 606-607 (although it was written long before the advent of duty/risk) supports a finding of causation in the instant case:
... we find that the speed of the train was excessive, and of itself constitutes negligence which renders the defendant company liable.
The evidence shows a speed of at least 30 miles an hour ... and the evidence shows that this crossing, although at the boundary line of the corporate limits which the train was entering, and although the closely built-up part of the city does not reach quite that far, is as much used as any other crossing in this city of 6,000 inhabitants.
The city ordinance regulating the speed of trains located the speed limit several streets further inside of the city, and it is argued that this practically amounted to a permission to the railroad to run at ordinary speed at this crossing; but the rules of the defendant company provided that within the limits of Crowley the speed should not exceed six miles an hour; and prudence would dictate that a crossing so near the built-up part of a city as to be used as any other crossing in the city should be approached at a less rate than thirty miles an hour.
The automobile was going in the same direction as the train, and along a road which for some distance before reaching the crossing paralleled the railroad, about 75 feet away from it on the fireman's side of the train. The fireman saw the automobile, and if, when he first saw it, and, indeed, for some time afterwards, he had suspected that it would attempt to cross ahead of the train, he could have stopped in time; but, when he did realize that it was going to cross, it was too late. Defendant contends that it would equally have been too late even if the speed had been the 15 miles fixed in the ordinance, and that therefore the proximate, or, in other words, the sole legal, cause of the accident was the act of the automobile in coming upon the track; and for showing that the accident would equally have been unavoidable if the speed of the train had been less, defendant adduces computations of seconds and number of feet. But that argument takes into consideration only what was possible to be done by the fireman and engineer; it loses sight of what was possible to be done by the occupants of the automobile (emphasis supplied) ... The slower either the train or the car had been going, the greater would have been the margin of safety.
The speed of the train was a cause in fact of the accident. The trial court's determination of liability was correct.

QUANTUM
Included in the $522,776.00 award to Sandra was $400,000.00 for general damages and $116,776.00 for loss of future wages and $6,000.00 for future medical expenses. Appellants contend that the general damages award was excessive. They argue the awards for lost wages and future medical expense should be totally disallowed as these awards are speculative and not supported by the evidence.
*606 GENERAL DAMAGES
The trier of fact has much discretion in fixing the amount of general damages. LSA-C.C. 1934(3); Gaspard v. Le-Maire, 245 La. 239, 158 So.2d 149 (1963); Reck v. Stevens, 373 So.2d 498 (La.1979). That award cannot be disturbed on appeal unless the record clearly reveals the trier of fact abused its discretion in making the award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Reck v. Stevens, supra.
In support of their argument that the $400,000.00 awarded is excessive, appellants cite three cases where the plaintiffs were awarded lower sums for what appellants claim were similar injuries.[6] As was stated in Coco v. Winston Industries and Reck v. Stevens, supra, no two cases are ever exactly the same and the initial determination of abuse of discretion must be made from the individual facts and circumstances of each particular case. Prior awards are of little value in making this determination. It is only after this determination is made that the consideration of prior awards is proper for determining what would be an appropriate award. With these principles in mind, we address the facts and circumstances of this case.
Sandra was a 16 year old junior in high school when the accident occurred. Prior to her injury she was a very active young lady. She participated in sports such as basketball, softball and gymnastics. She belonged to various school clubs. She was a member of the band and flag line. She was outgoing, cheerful, and made friends easily. She was well thought of by her friends and teachers. She made respectable grades in high school without putting forth much effort and planned to attend college after completion of high school. Her teachers and counselors considered her to be good college material.
In the accident Sandra sustained multiple lacerations and abrasions; however, the most serious injuries Sandra suffered in the accident were a closed head injury and a compression fracture of her spine at the L-2 level. She was in the hospital for over 6 weeks. During this time she was in a coma for between 2 and 3 weeks and she underwent an operation on her back.
Because of her head injury Sandra was unable to speak when she first began coming out of the coma. She regained this ability gradually. By the time of trial, in April, 1983, she had not fully recovered the ability to speak properly. She still slurred her words and stuttered from time to time. The head injury included a brain injury which caused a decrease in her higher mental capacity.
Sandra finished her junior year in high school under the direction of a homebound teacher. During the time she worked with this teacher, she experienced unusual difficulties with her school work as a result of her head injury. She was unable to concentrate and her ability to remember was limited. She had to repeatedly go over her lessons in order to pass her tests and her mother did 90-95% of her school work. The next fall Sandra returned to school for her senior year. She experienced the same difficulties she had when working with the homebound teacher. Although she finished the year with approximately the same grades she made before the accident, she had to work much harder for them. At the beginning of her senior year Sandra enrolled in a cooperative education program in which the students attend school half a day and work for half a day. While in the program she was fired from three jobs because she was unable to retain the necessary information to do the required work. She was subsequently dropped from the program.
During her senior year Sandra took a series of tests which revealed she was no longer able to do college level work. Because *607 of the test results and the difficulty she was having with her high school work, she decided not to attend college and entered business school instead. When she first entered business school she enrolled in a medical secretary course. She discontinued this course because she was unable to remember the information necessary to pass. She is now taking a general secretary course. Although she does fairly well in subjects which are a repeat of what she learned in high school, she has difficulty with new subjects, such as word processing and accounting.
Because of Sandra's head injury she has undergone personality changes. Where she was once outgoing and made friends easily, she is now introverted and irritable. She has also become insecure and doubts her abilities.
Sandra underwent two operations on her back. In the first, which was performed during the time she was in the hospital following the accident, a piece of bone was removed from her hip and grafted to her spine. Two metal plates were inserted around her spine to hold the graft in place and to support her back. When she first awoke from the coma she was unable to walk and had to relearn this skill. She was required to wear a back brace every time she got out of bed for six months. When she first got out of the hospital she required the services of a physical therapist. These services were performed in her home. At first the therapist came every day but later his visits tapered off to 2 or 3 times per week. The second operation took place in April, 1982. In that operation, the plates were removed from around her spinal column. Sandra described this operation as the most painful experience she ever had.
Sandra has continued to experience problems with her back. She is severely restricted in her physical activities and often experiences a great deal of pain. Her doctors estimate that she will continue to experience chronic back pain for the remainder of her life and will always need to take pain medication. The outward manifestations of the injury are that she walks with a limp and has a noticeable malformation in the curvature of the spine. Both conditions are permanent. The medical testimony estimates that she has a 30-35% permanent disability in her back and another 10-15% permanent disability in her legs as a result of the back injury. She has a 40% disability as related to the body as a whole. Conservative estimates are that the disability rating to her body as a whole will increase another 10-20% as she gets older.
In support of their argument that the general damages award was too high, appellants point out that Sandra is enrolled in modeling school and is engaged to be married.[7] Appellants also argue that to all outward appearances Sandra does not show any residual effects of the accident. In light of the above discussion of the extent of Sandra's injuries and the resulting permanent disability caused by those injuries, appellants' argument warrants no consideration.
We find no clear abuse of discretion in the trial court's general damage award.
LOSS OF FUTURE WAGES
In his reasons for judgment the trial judge specifies that the damages awarded Sandra are based on the extent of her injuries and the diminished capacity resulting therefrom. The figure of $116,776.00 for loss of future wages is based upon the testimony of Dr. Melvin Harju who qualified as an expert economist at trial. Dr. Harju testified to the mean earnings which a female of Sandra's age could expect to earn over her lifetime given the relevent social data. According to his calculations, if Sandra had gone to college as she intended before the accident and obtained a degree, the present value of her lifetime earnings would have been the sum of $587,052.00. As a high school graduate the present value of her lifetime earnings *608 would be the sum of $470,276.00. The trial judge awarded the difference between these two figures.
We note that Dr. Harju's figures are at the low end of the earnings scale. They are based on 1977 data. There has been a significant improvement in women's working patterns and earnings since the data was compiled.
Appellants argue that the entire award on this item of damages should be disallowed since it is based on mere speculation. They point out that at the time of the accident Sandra was in high school and had not entered the work force, and she did not in fact go to college.
As is the case with general damages the trial judge has much discretion in fixing an award for loss of future wages. Hill v. Sills, 404 So.2d 1323 (La. App. 2d Cir.1981); Green v. Farmers Ins. Co., 412 So.2d 1136 (La.App. 2d Cir.1982). The award for loss of future wages does not require an actual loss of earnings, it may be based on loss of earning capacity which is a person's ability to make money. These damages may be awarded even if the injured party has never taken advantage of that capacity. Folse v. Fakouri, 371 So.2d 1120 (La.1979); Hill v. Sills, supra; Green v. Farmers Ins. Co., supra. Furthermore, loss of future wages cannot be calculated with absolute certainty, damages for this loss are somewhat speculative in nature. Hill v. Sills, supra; Green v. Farmers Ins. Co., supra.
Sandra suffered a significant loss of mental and physical capacity. The trial judge correctly concluded that she had a resulting substantial loss of earning capacity. While there is no way to know if Sandra would have carried out her plans to attend college and obtain a degree, she lost the opportunity to undertake the college work because of her brain injury. We find no abuse of discretion in basing the award on the difference between what she could expect to make with a degree and without one.
There is substantial evidence in the record to support the future medical expense award and we find no abuse of discretion by the trial judge in making this award.
The judgment is AFFIRMED at appellants' cost.
NOTES
[1] Malcolm Wallace, father of Kelly Wallace, was cast in judgment in solido with the appellants but he did not appeal.
[2] Sec. 24-1. Speed at crossings.

(a) It shall be unlawful for any person to drive or move, or cause to be driven or moved, any railway locomotive, engine or train into or across any paved street or highway within the city at a speed exceeding five (5) miles per hour, except that where a standard system of signal lights or bells, visible or audible at a distance of three hundred (300) feet in either direction shall be installed and maintained by the railroad company at the intersection of said railroad with any such street or highway, or where such railroad company shall maintain a watchman or flagman, or install and maintain movable barriers at such intersection, any such railroad locomotive, engine or train may be driven or moved across any such street or highway intersection at a speed not to exceed fifteen (15) miles per hour while crossing said intersection.
[3] Section 24-3 of the Bossier City Train Ordinance requires trains to stop at all crossings that do not contain one of the warning devices described in Sec. 24-1. At such crossings the trains is to be preceded by a flagman or switchman. In his reasons for judgment the trial judge did not base liability in part on the train's violation of Ordinance No. 24-3 requiring trains to stop and dispatch a flagman at crossings such as the one in question. Because of our finding that liability was correctly imposed for the violation of the speed limit ordinance on which the trial judge relied, we do not address plaintiff's contention that appellants were also liable because of their violation of Sec. 24-3.
[4] The state conducted the count at the city's request.
[5] Sec. 24-2. Blocking crossings.

(a) It shall be unlawful for any locomotive engine, switch engine or train to block any hard surfaced or paved street or any highway within the city for a period of longer than five (5) consecutive minutes either by a physical obstruction of the way or by operating the locomotive engine, switch engine or train in such a manner as to activate automatic traffic control devices which unnecessarily impede the flow of traffic.
[6] Appellants cite Sutton v. Langley, 330 So.2d 321 (La.App. 2d Cir.1976) ($41,100.00 award affirmed); Hebert v. Missouri Pacific Railroad Company, 366 So.2d 608 (La.App. 3d Cir.1978) ($250,000.00 award affirmed); Martinez v. U.S. Fidelity and Guar. Co., 423 So.2d 1088 (La.1982) ($147,000.00 award affirmed).
[7] Sandra testified she was going to modeling school in order to learn to walk where her limp would be less noticeable.