536 So.2d 733 (1988)
William BRESHERS, Individually and on Behalf of his minor son, William Dino Breshers, Plaintiffs-Appellants,
v.
DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, STATE OF LOUISIANA, et al, Defendants-Appellees.
No. 87-1040.
Court of Appeal of Louisiana, Third Circuit.
December 14, 1988.
Rehearing Denied January 31, 1989.
*734 Broussard, Bolton & Halcomb, Dorwan Vizzier, Alexandria, for plaintiffs-appellants.
Wilson & Walker, Gregory H. Walker, Alexandria, Watson, Murchison, ETC, Joseph B. Stamey, Natchitoches, Thomas G. Wilson, Colfax, William Guste, Baton Rouge, for defendants-appellees.
Before GUIDRY, FORET and KNOLL, JJ.
GUIDRY, Judge.
On June 12, 1977, William Dino Breshers (hereafter Dino) was riding as a guest passenger on a motorcycle operated by another minor, George Breaux, Jr., when it collided with a pickup truck owned and driven by John M. Wardlow. The accident occurred on a country lane in Grant Parish. Dino sustained serious personal injuries as a result of the accident. His father, William C. Breshers, instituted this suit against John M. Wardlow and his insurer, Commercial Union Insurance Company (hereafter Commercial Union); Grant Parish Police Jury and its insurer, Northeastern Fire Insurance Company; Town of Montgomery and its insurer, Market Insurance Company; and, the State of Louisiana, through the Department of Transportation and Development (hereafter DOTD).[1] All defendants filed cross-claims, one *735 against the other, and third party demands against the Breauxs. Additionally, defendants, Wardlow, Commercial Union and Grant Parish Police Jury, reconvened against William C. Breshers and Dino urging their contributory negligence. The State of Louisiana, through the Department of Health and Human Resources (hereafter DHHR), filed a petition of intervention seeking recovery of certain medical expenses incurred by it on behalf of William Dino Breshers. DHHR subsequently dismissed its intervention insofar as concerns DOTD.
The trial court, by judgment dated January 14, 1987, dismissed all of plaintiffs' demands against DOTD as well as all incidental demands filed by or against DOTD. Thereafter the matter proceeded to bifurcated trial against all remaining defendants. A jury unanimously found defendant, John M. Wardlow, free of any fault or negligence. The trial judge concluded that defendants, Grant Parish Police Jury and the Town of Montgomery, were also free of any fault or negligence. Accordingly, on June 15, 1987, the trial court rendered judgment dismissing plaintiffs' demands against all remaining defendants and likewise dismissed all cross-claims and incidental demands filed by or against all parties. Plaintiffs alone appealed from both judgments.

FACTS
On June 12, 1977,[2] George Breaux, Jr., a minor-unlicensed driver, was operating a motorcycle owned by his father, George Breaux, Sr., in a northerly direction on Rogers Lane in Grant Parish, Louisiana. Dino Breshers was a passenger on that motorcycle. The Breaux motorcycle was being operated abreast of another motorcycle being driven in the same direction by Greg Roberts with Darren McManus as a passenger. With the Breaux motorcycle on the left, the two motorcycles proceeded in a northerly direction up a straightaway to a curve in Rogers Lane. Just as Breaux was beginning to slow down with the intention of falling behind the Roberts' motorcycle in order to negotiate the curve, the motorcycles were met by a 1975 Ford pickup truck driven by John M. Wardlow which was proceeding in a southerly direction on Rogers Lane. Breaux veered to his left and Wardlow, in an attempt to avoid the motorcycles, braked and veered to his right. The right front of the Wardlow truck collided with Breaux's motorcycle near the western edge of the roadway between the blacktop and the shoulder. Both the Breaux motorcycle and Dino Breshers were pinned under the Wardlow truck. As a result of the accident, Dino suffered a traumatic amputation of his right leg below the knee; a fracture of the femur of his right leg; an open fracture of the distal tibia and fibula of the left leg; a large skin injury to the lower left leg; and, a concussion.
Rogers Lane is a dead-end country lane which does not connect with any major thoroughfare. It begins at some point within the corporate limits of the Town of Montgomery and dead-ends at the entrance to the John Wardlow farm. Rogers Lane serves as an ingress and egress route for approximately eleven or twelve families. According to the record, Rogers Lane was originally a narrow lane, described by some witnesses as a "pig trail". Rogers Lane was eventually graveled and later blacktopped. At the accident site, the blacktopped surface of Rogers Lane is only twelve feet wide, with no center line or traffic control signs. At the time of accident, the shoulders of Rogers Lane were severely overgrown with tall brush and trees all the way up to the edge of the blacktopped surface. This overgrowth of vegetation severely restricted sight around the curve.
On appeal, plaintiffs urge trial error in the following particulars:
1. The jury erred when it found John M. Wardlow free of any fault in causing the accident.
2. The trial judge erred when he determined that the maintenance of Rogers Lane, at the site of the accident, was not the responsibility of the Grant Parish Police Jury.

*736 3. Alternatively, the trial court erred when it determined that the State of Louisiana, through the Department of Transportation and Development and/or the Town of Montgomery was without responsibility for the maintenance of Rogers Lane.

ISSUE NO. 1
Appellants contend that the jury erred in finding that defendant, John M. Wardlow, was free of fault or negligence in causing the accident.
The record reflects that Wardlow was traveling in a southerly direction near the middle of the road on Rogers Lane at approximately 25 miles per hour. When Wardlow rounded the curve, he observed the two oncoming motorcycles riding abreast. Wardlow immediately veered to the right and applied his brakes. Breaux veered to the left. The vehicles collided on the west side of the roadway between the blacktop and the shoulder.
Plaintiffs' own traffic expert analyzed Wardlow's actions leading up to the accident and concluded that Wardlow did what a prudent driver would have done. He stated that given the narrow width of Rogers Lane and the overgrown condition of the foliage along the roadside, Wardlow positioned his vehicle near the center of the road, as most drivers would have in negotiating the curve. He further testified that the motorcycles, positioned two abreast on the road, presented an unsafe condition and that Wardlow had no control over Breaux's decision to veer left. Plaintiffs' expert concluded that because of the overgrown condition of the foliage along Rogers Lane, the road was unreasonably dangerous because vehicles were unable to see other vehicles far enough around the curve.
Our careful review of the record in this case reveals no clear error in the jury's determination that John Wardlow was free of accident fault. Wardlow was traveling at a reasonable rate of speed. Although he was traveling near the middle of the narrow roadway, there is no evidence that, at the time of the accident, he was traveling on that portion of Rogers Lane reserved for south bound traffic. As soon as he was able to discern the presence of the oncoming motorcycles, proceeding abreast, he took evasive action, braking and pulling his vehicle as far to the right as possible. For these reasons, we find no merit in plaintiffs' first assignment of error.

ISSUES NO. 2 AND 3
Appellants next urge that the trial judge erred when he concluded that the maintenance of Rogers Lane at the site of the accident was not the responsibility of the Grant Parish Police Jury. We agree and reverse.
In Wall v. American Employers Insurance Company, 215 So.2d 913, 916 (La.App. 1st Cir.1968), writ denied, 217 So. 2d 415 (La.1969), our brethren of the First Circuit stated:
"... There can be little doubt but that it is the duty of either the State of Louisiana, or the parish or incorporated municipality in which a public road or highway lies, to make the highways safe for travel...." (Citations omitted).
Plaintiffs do not seriously contend, nor could they, that the State of Louisiana or the Town of Montgomery had a duty to maintain and make Rogers Lane safe for travel. The accident occurred far outside the corporate limits of the Town of Montgomery. Rogers Lane is not expressly included in the state highway system. La. R.S. 48:21, 48:191. There is no evidence that the State contracted to maintain Rogers Lane. La.R.S. 48:193(G). Under such circumstances, the State of Louisiana and the Town of Montgomery had no duty to maintain and/or make Rogers Lane safe for travel. Wall, supra.
The accident occurred on that part of Rogers Lane which lies in Grant Parish but outside the corporate limits of the Town of Montgomery. This being uncontroverted and since the State has been shown to have no responsibility for the maintenance of Rogers Lane, it necessarily follows that, if Rogers Lane is a public road, such responsibility fell to the Parish of Grant.
*737 In his written reasons for judgment, the trial judge stated:
"However, due to the evidence and the credible testimony presented, this Court can not say that the maintenance of the roadway was a duty imposed upon the Grant Parish Police Jury. The plaintiff bears the burden of proving that the Grant Parish Police Jury is responsible for the upkeep of Rodgers [sic] Lane. The plaintiff failed to carry this burden. No evidence was produced at trial to convince this Court that the Grant Parish Police Jury is charged with maintenance of the road in question. There was no showing of tacit dedication or that the Parish of Grant in any way acted in such a fashion that could be construed as giving it responsibility for maintenance of Rodgers [sic] lane. This Court holds therefore that maintenance for Rodgers [sic] Lane was not a duty imposed upon the Grant Parish Police Jury in 1977."
We find the trial judge's conclusion regarding the status of Rogers Lane clearly erroneous. The record abounds with evidence that Rogers Lane was kept up, maintained and worked by authority of the governing authority of Grant Parish for many years prior to the accident. This being so, Rogers Lane is a public road and the Parish of Grant was responsible for the maintenance of that portion thereof which lay outside the corporate limits of the Town of Montgomery. La.R.S. 48:491.
With reference to the duty of a parish police jury to maintain its highways, roads, and streets, the Louisiana Supreme Court, in Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975), stated, at pages 432-433:
"A parish police jury, however, is not an insurer of travelers upon its highways, roads and streets. The duty owed is to exercise reasonable care to keep these public ways in such condition that travelers who are prudent and ordinarily careful will not be exposed to injury, day or night. Louisiana's jurisprudence on the subject is built upon the theory that fault is a prerequisite to responsibility in these cases. E.g. Goodwyn v. City of Shreveport, 134 La. 820, 64 So. 762 (1914) and Suthon v. City of Houma, 146 So. 515 (La.App.1933).
Although a parish is not an insurer of the safety of travelers on its highways, roads and streets and it must keep these ways reasonably safe, they need not be maintained in perfect condition to render the parish free from liability in damages. Defects which are not in the nature of traps, or from which danger cannot reasonably be anticipated, provide no actionable negligence. Liability will only be imposed when the defect is dangerous or calculated to cause injury. Arata v. Orleans Capitol Stores, 219 La. 1045, 55 So.2d 239 (1951); White v. City of Alexandria, 216 La. 308, 43 So.2d 618 (1949).
There is no fixed rule for determining what is a dangerous defect in a public way; the facts and surrounding circumstances of each particular case control. The test usually applied, however, requires an answer to the question: Was the public way maintained in a reasonably safe condition for persons exercising ordinary care and prudence? Arata v. Orleans Capitol Stores, supra; cf. Nessen v. City of New Orleans, 134 La. 455, 64 So. 286 (1914); Allen v. Town of Minden, 127 La. 403, 53 So. 666 (1910)."
The trial judge, in his written reasons for judgment, stated:
"... There can be no question in this Courts [sic] mind that had the vegetation present on the side of the roadway been removed, vision around the curve would have been greatly improved and this accident possibly would not have occurred. Equally had the roadway been wider, the possibility of an accident would also have been reduced.
This Court holds that improper maintenance of the road was the proximate cause of the accident."
The record confirms the correctness of the trial judge's conclusion that the Parish of Grant's failure to properly maintain Rogers Lane was, at the very least, a contributing *738 proximate cause of the accident.[3] William D. Breshers, George Breaux, Jr. and John M. Wardlow testified that they could not see around the curve because of the overgrown brush and overhanging tree limbs alongside the road. Plaintiffs' expert traffic engineer unequivocally concluded that the accident would not have occurred had the shoulders been properly maintained, particularly along the inside of the curve. He also determined that there was an interconnection between the overgrown foliage, narrow pavement width, and severity of the curve in causing the accident.
We conclude that the Parish of Grant failed in its duty to properly maintain Rogers Lane and that such failure resulted in the creation of an unreasonable risk of injury to those using such road and exercising ordinary care and prudence. This being so the Parish of Grant is responsible for the damages sustained by plaintiffs. La.C.C. art. 2317. Finally, we observe that there is no evidence in the record to even suggest that the Breshers were guilty of contributory negligence.
For these reasons, we reverse the trial court's finding of no liability on the part of Grant Parish and proceed to a determination of the quantum of damages owed to plaintiffs. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). However, before we proceed to the issue of quantum, we consider the effect of the failure of all defendants to appeal the judgment of the trial court with respect to all incidental and cross demands.
The trial court dismissed all third party claims by or against all parties. Among the claims dismissed by the trial court's judgment was Grant Parish Police Jury's third party demand against George Breaux, Sr. and George Breaux, Jr., as well as DHHR's claims against all defendants. Defendant, Grant Parish Police Jury, and intervenor, DHHR, neither appealed nor answered the appeal.
In Roger v. Estate of Moulton, on rehearing, 513 So.2d 1126 (La.1987), the plaintiff applied for and the Supreme Court granted a writ of certiorari. The Supreme Court rendered judgment in favor of plaintiff reversing the Court of Appeal judgment which had rejected plaintiff's demands. Intervenor, who made no writ application because of the favorable Court of Appeal judgment, sought reinstatement and reconsideration of its claim for reimbursement. The Supreme Court refused to consider intervenor's claim finding that, because of intervenor's failure to apply for certiorari, its claim for reimbursement was not properly before the court. In that case, the court stated, at pages 1136-1137:
"The classic statement of this principle appears in the opinion of Mr. Justice Brandeis, in United States v. American Railway Express Co., 265 U.S. 425, 44 S.Ct. 560, 68 L.Ed. 1087 (1924):
`[A] party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party. In other words, the appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below. But it is likewise settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack on the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.' 265 U.S. at 435, 44 S.Ct. at 564.
In other words, if a party seeks to raise issues that call for a change in the judgment below, he must file an appeal or petition, but if he merely makes alternative arguments in support of the judgment, he need not. Moore, supra at 204.11[3] n. 15; R. Stern, E. Gressman & S. Shapiro, supra at § 6.35; R. Stern, When *739 to Cross-Appeal or Cross-PetitionCertainty or Confusion?; 87 Harv.L.Rev. 763 (1973).
* * * * * *
Superficially it may appear anomalous that a successful litigant in the court of appeal should be under any necessity of applying for certiorari here after a decree which brought him victory. But the judgment may, as here, be comprised of several elements, adverse as well as favorable. If the prevailing party wishes to rely alternatively in this court upon a contention rejected below which would change the court of appeal judgment, he must preserve his rights by an application for certiorari. In the absence of such preservation of the argument, the successful litigant must be taken to have regarded the grounds upon which he won as so strong that he is content to rely on them alone in the certiorari proceedings. See, e.g., Anthony v. Petroleum Helicopters, Inc., 693 F.2d 495, 498 n. 6 (5th Cir.1982). Although at times criticized, the rule that an appellee or a respondent may not attack the judgment below seems reasonable and desirable in order to prevent surprise and focus the attention of the court and the other party on the issues to be raised and, in the Supreme Court, to aid the court in evaluating whether the grant of certiorari is justified. See R. Stern, When to Cross-Appeal or Cross-PetitionCertainty or Confusion?; 87 Harv.L.Rev. 763 (1973); Note, 51 Harv.L.Rev. 1058 (1938)."
Although Roger, supra, involves the failure of a successful litigant to apply for certiorari, we know of no valid reason why a different result should be reached where an appeal is involved. Accordingly, since the Grant Parish Police Jury and DHHR neither appealed nor answered the appeal, their right to alter the judgment below has been forfeited.

QUANTUM
After the accident, the injured plaintiff remained under the pickup truck for approximately 45 minutes before he was removed and taken by ambulance to Rapides General Hospital. He was diagnosed by Dr. Douglas Gamburg as having sustained an incomplete traumatic amputation below the right knee with a closed fracture of his right femur. In addition, he suffered an open fracture of his left distal tibia and fibula with extensive soft tissue loss. He also suffered a concussion.
At Rapides General Hospital, he underwent four operations. The first operation was a completion of the below-knee amputation with debridement of the open fractures to remove necrotic skin and the placement of Steinmann pin fixations in the left open fracture. On June 16, 1977, a re-debridement on both legs was performed. On June 20, 1977, Dr. Gamburg performed debridement, dressing change on the left leg and insertion of Steinmann pins in the left proximal tibia and left first metatorsal. On June 29, 1977, plaintiff was transferred to Huey P. Long Hospital and remained hospitalized there until August 1, 1977. Plaintiff had two operations while a patient at Huey P. Long for placement of a Rush rod in the left fibula with a Stone Staple, two split thickness skin grafts to the lower left leg and debridement. In September of 1977, plaintiff was admitted to the Shriner's Hospital for Crippled Children in Shreveport where surgery was performed for the removal of the Rush rod from his left leg. While a patient at Shriner's plaintiff underwent extensive physical therapy. Although plaintiff was discharged from Shriner's on November 16, 1977, he continued as a patient in their Limb Clinic until he was 21 years of age. Upon his discharge from Shriner's Hospital, plaintiff used crutches until he was fitted with an artificial leg.
Upon being released from Shriner's, Dino began the eighth grade and eventually completed the 10th grade before quitting school. He then later enrolled in Bobby Smith's Welding School and became a certified welder. He worked for approximately six months as a welder but was forced to discontinue because the requisite standing, walking and climbing resulted in the swelling of his left ankle and blistering of his right stump. At this point, he attempted to *740 work as a service station attendant, a welder's helper and a woodcutter but was unable to continue those employments because of problems with his legs. Finally, in September of 1985, Dino again tried employment as a woodcutter. Although he was unable to perform that work satisfactorily, his employer was impressed and changed his job duties to that of a skidder operator.[4] Dino has worked as a skidder operator since that time. At the time of trial, Dino was earning in excess of what he would have earned as a welder.
Dr. Baer Rambach, an orthopedic surgeon and plaintiff's attending physician at Shriner's Hospital, testified that, although the fractures and right stump have healed, plaintiff continues to have residual problems in his left leg and ankle, such as swelling, weakness, reduced motion, soft tissue loss and numbness over the top portion of his foot. Dr. Rambach indicated that these complaints were permanent and consistent with the injuries suffered by plaintiff. Dr. Rambach also explained that it was more probable than not that plaintiff will need to undergo an ankle fusion due to traumatic arthritis developing in his left ankle but was unable to state if and when such a procedure would be necessary.

GENERAL DAMAGES
Plaintiff sustained severe injuries to both legs. His right leg was amputated below the knee and he underwent extensive medical treatment to save his left leg which sustained a one-third loss of tissue mass in the calf area. Plaintiff suffered these injuries when he was a 13 year old minor and, as a result, he had to refrain from the activities of a normal 13 year old. Plaintiff has suffered permanent disability and disfigurement. His pain has been excrutiating at times and he will continue to feel a degree of discomfort for the remainder of his life. We believe that, under the circumstances, an award of $200,000.00 in general damages is justified.

PAST MEDICAL EXPENSES
William C. Breshers is entitled to recover the medical expenses incurred by him for treatment of Dino's injuries, during the latter's minority. The record reflects the total of such expenses to be $3,238.65, i.e., $2,314.65 owed to Huey P. Long Hospital and $924.00 to Dr. Douglas Gamburg.

FUTURE MEDICAL EXPENSES
The only item of future medical expense established in the record is that for an artificial leg replacement and stump socks amounting to the sum of $2,009.03. Dino is entitled to recover these future medical expenses.

PAST LOST EARNINGS
Dr. Jan Dugger, an economist, testifying on behalf of Dino, calculated his past lost wages to be $22,519.00. In calculating plaintiff's loss of earnings to date of trial, the economist utilized plaintiff's wages as a welder, i.e., $6.25 per hour, plus a 6% annual increase in wages for the period from January 1983 (the date when he began work as a welder) to September 1985 (the date when he began work as a skidder operator with B & C Wood Co.), discounted to present value less what he was actually earning during that period of time. In this connection, Dr. Dugger stated that plaintiff sustained no further wage loss once he began working for B & C Wood Co., Inc. as a skidder operator. There is nothing in the record to contradict or refute this evidence. Accordingly, we conclude that Dino is entitled to an award in the amount of $22,519.00 for past lost earnings.

LOSS OF FUTURE EARNINGS
Dr. Dugger, plaintiff's expert, testified that if Dino continued as a skidder operator, he would suffer no loss of future wages or earning capacity. However, Dr. Dugger opined that if plaintiff were forced, because of physical disability to cease his employment as a skidder operator, he would sustain a loss of future earning capacity *741 in the amount of $158,686.00. Dr. Dugger calculated Dino's future earnings loss as follows: the difference in his wages as a welder working 40 hours per week for 50 weeks per year times his remaining work life expectancy (33.6 additional years), plus a 6% wage increase annually, plus 13% for benefits discounted to present day value, less what he would have earned as a minimum wage earner working 40 hours per week for 50 weeks per year, times his work life expectancy (33.6 additional years), plus a 6% wage increase annually, plus 13% benefits discounted to present value. Dr. Dugger, on this same basis, calculated that if plaintiff continued at his present job as a skidder operator for five years post trial his future earnings loss would amount to $131,442.00. Finally, as aforestated, Dr. Dugger admitted that if plaintiff was able to continue as a skidder operator throughout the remainder of his work life expectancy, he would suffer no loss of future earnings, and in fact would earn much more than he would as a welder.
The law regarding loss of future earnings is stated in Ward v. La. and Ark. Ry. Co., 451 So.2d 597 (La.App. 2d Cir.1984), at page 608, as follows:
". . .
The award for loss of future wages does not require an actual loss of earnings, it may be based on loss of earning capacity which is a person's ability to make money. These damages may be awarded even if the injured party has never taken advantage of that capacity. Folse v. Fakouri, 371 So.2d 1120 (La.1979); Hill v. Sills, supra; Green v. Farmers Ins. Co., supra. Furthermore, loss of future wages cannot be calculated with absolute certainty, damages for this loss are somewhat speculative in nature. Hill v. Sills, supra [404 So.2d 1323 (La.App.2d Cir.1981)]; Green v. Farmers Ins. Co., supra [412 So.2d 1136 (La.App.2d Cir. 1982)].
There is no clear evidence in the record indicating that plaintiff will not be able to continue to perform the duties of a skidder operator during his worklife expectancy. Although the evidence reflects that plaintiff experiences some pain and discomfort in the performance of his duties and does experience more difficulty in the performance of his duties than a person with two good legs, he nevertheless has worked as a skidder operator since September 1985. Further, there is no medical or other evidence concerning when, if ever, plaintiff's disability will render him unfit to perform his job as a skidder operator. Hence, any award for loss of future earnings would be purely speculative and highly conjectural. Consequently, we conclude that plaintiff is not entitled to an award for future loss of earning capacity.

CONCLUSION
For the above and foregoing reasons, the judgment of the trial court is reversed and set aside insofar as it dismisses plaintiffs' demands against the Grant Parish Police Jury. Accordingly, it is ordered, adjudged and decreed that there be judgment in favor of William C. Breshers and against the Parish of Grant, Louisiana, in the full sum of THREE THOUSAND TWO HUNDRED THIRTY-EIGHT AND 65/100 ($3,238.65) DOLLARS, together with legal interest on such sum from date of judicial demand until paid. Further, it is ordered, adjudged and decreed that there be judgment in favor of William Dino Breshers and against the Parish of Grant, Louisiana, in the full sum of TWO HUNDRED TWENTY-FOUR THOUSAND FIVE HUNDRED TWENTY-EIGHT AND 03/100 ($224,528.03) DOLLARS, together with legal interest on such sum from date of judicial demand until paid. Costs at the trial level and on appeal are assessed to the Parish of Grant, Louisiana, except such costs from which, by operation of law, it may be exempt. In all other respects, the judgments appealed from are affirmed.
REVERSED IN PART; AFFIRMED IN PART; AND, RENDERED.
NOTES
[1] Following institution of suit, Dino came of age and was substituted as a party plaintiff.

Plaintiffs' claims against Northeastern and Market and all incidental demands filed by or against these companies were severed for separate trial after both companies gave notice of receivership and/or liquidation.
[2] The cause of action sued on arose prior to the adoption of Louisiana's comparative fault law.
[3] Since this matter arose prior to the adoption of Louisiana's comparative fault law, we need not consider whether others, including George Breaux, Jr., were at fault in causing the accident.
[4] A skidder is a four-wheeled drive off road vehicle designed with a set of tongs on the front end and is primarily used to haul trees to a central location in the woods and pile them. The operator's platform is located approximately four feet above ground.